IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| RESOURCE MANAGEMENT COMPANY, INC., | ) ) ) | NO. 3:18-cv-00433 |
| Plaintiff/Counterclaimant-Defendant, | ) ) ) | JUDGE RICHARDSON |
| v. | ) ) | |
| WFC DURHAM HOLDINGS VII LLC and PHILADELPHIA INDEMNITY INSURANCE COMPANY, | ) ) ) ) | |
| Defendants/Counterclaimants. | ) ) | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

This matter proceeded to a bench trial between Plaintiff/Counterclaimant Defendant Resource Management Company, Inc. ("RMC"), and Defendant/Counterclaimant WFC Durham Holdings VII LLC ("WFC").[1] Following the conclusion of the bench trial on December 22, 2021, RMC and WFC submitted respective proposed Findings of Fact and Conclusions of Law (Doc. Nos. 110 ("RMC's Proposal"), 111 ("WFC's Proposal")). Thereafter, the Court granted in part and denied in part "Defendants' Motion to Strike" (Doc. No. 112), which sought to strike from the record two different kinds of evidence introduced by RMC, in an order to which the Court will adhere below.[2]

---

[1] As noted below, RMC's claims against WFC's Co-Defendant/Co-Counterclaimant, Philadelphia Indemnity Insurance Company, were not addressed at trial; instead, the parties agreed to defer proceedings on those claims until resolution of the claims between RMC and WFC.

[2] The two kinds of evidence were (1) "all testimony elicited by [RMC] regarding WFC's payment of a third party, Kelchner," and (2) all testimony elicited regarding "Kelchner's performance in Phase 2 [of the Durham Farms development project]," i.e., evidence of the quality of Kelchner's performance in Phase 2 introduced by RMC to show essentially that RMC's performance on Phase 1B was comparable to

This case involves construction-project disputes concerning a real estate development known as Durham Farms, a subdivision in Hendersonville, Tennessee. RMC filed this action on April 23, 2018 in the Chancery Court for Sumner County, Tennessee. RMC's Complaint was verified and included the issuance of an Attachment to enforce its previously-recorded Materialmen's Lien, which had been recorded pursuant to Tennessee Code Annotated §§ 66-11-105, *et seq.*

Via the Complaint, RMC sought to recover amounts it claims to be owed under two horizontal-construction contracts into which it entered with a general partnership known as WFC Durham Holdings VII G.P., to which WFC (as defined above, i.e., WFC Durham Holdings VII LLC) is a successor. The contracts relate, respectively, to Phase 1A and Phase 1B of the development of Durham Farms. (The parties make no material distinction between WFC and its predecessor, WFC Durham Holdings VII G.P., and so the Court will use the term "WFC" to refer to both entities). WFC, for its part, has counterclaimed against RMC for damages it claims to have suffered due to RMC's alleged (a) incomplete work and (b) defective work under the contracts, and for delay allegedly caused by RMC's misfeasance and nonfeasance in performing under the contracts.

WFC bonded off the lien placed by RMC on the real estate implicated by the contracts, with the lien being insured by WFC's Co-Defendant, Philadelphia Indemnity Insurance Company

_____

Kelchner's performance in Phase II and thus in conformance with RMC's contractual obligations. (Doc. No. 112 at 1).The substance of that order need not be detailed herein. Suffice it to say that Defendants' Motion to Strike was granted with respect to the first kind of evidence and was technically denied (albeit with Defendant nevertheless succeeding substantively to a large extent) as to the second kind of evidence. That is, the Court struck evidence elicited by RMC of WFC's payments to Kelchner and, while not striking evidence of Kelchner's performance on Phase 2, limited its potential use to potentially serving as extrinsic evidence to impeach conflicting witness testimony on a matter the Court determines to be non-collateral (should such a purpose actually prove to be implicated).

("Philadelphia Indemnity"). That is, Philadelphia Indemnity is the surety on a bond posted by WFC to release the lien filed by RMC to secure its claims.

WFC removed the case to this Court. (Doc. 1).

By consent order entered November 29, 2021, RMC's claims against Philadelphia Indemnity were severed, i.e., reserved for decision as necessary following the resolution of the claims between RMC and WFC. (Doc. 98).

Herein, the Court sets forth its findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure. To the extent that the Court ostensibly indicates (via its placement herein or otherwise) that a statement herein is a finding of fact, and yet it could be considered instead a conclusion of law, the Court has, intends to, and hereby does render the statement according to its true nature, irrespective of the ostensible indication. Likewise, to the extent that the Court ostensibly indicates (via its placement herein or otherwise) that a statement herein is a conclusion of law, and yet it could be considered instead a finding of fact, the Court has, intends to, and hereby does render the statement according to its true nature, irrespective of the ostensible indication.[3]

The Court herein adjudicates both the claims of RMC and the counterclaims of WFC. Those claims are described more fully below but are summarized here briefly, beginning with RMC's claims. During the course of RMC's work on Phase 1A, WFC held back a portion of RMC's Fee Applications, as retainage. WFC eventually released most of the retainage to RMC, ultimately holding on to $100,609.04. (*Id.*). RMC asserts a claim to recover retainage, plus

---

[3] The Court notes that its "conclusions of law" section herein includes some determinations that are appropriately considered findings of fact or at least mixed findings of fact and law. This is necessary, in the Court's view, to avoid redundancy that would be fostered by strictly setting forth a statement (findings) of all relevant facts before going back and discussing those facts again when pronouncing conclusions of law.

statutory penalties, interest, and legal fees under the Tennessee Prompt Pay Act (Tenn. Code Ann. §66-34-101, *et seq*.). Likewise, during the course of RMC's work on Phase 1B, WFC held back $370,270 as retainage. RMC asserts a claim to recover that retainage, plus statutory penalties, interest and legal fees under the Prompt Pay Act.

RMC also has a claim to recover amounts billed in its final two Fee Applications (P-20 and P-21, Fee Applications No. 16 and 17, respectively) submitted to WFC. Those Fee Applications, which were the only ones that WFC did not pay, each related to Phase 1B and were in the amount— net of the 5-percent retainage that WFC would have been expected to hold—of $509,834.82 and $218,046.19, respectively.[4]

RMC seeks a judgment against WFC in the amount of $1,198,770.05, comprising the sum of the remaining retainage for both phases and the two unpaid fee applications. RMC also seeks pre-judgment interest and fees, as well as penalties under the Prompt Pay Act. (Exh. P-21).[5]

As for WFC, its smaller counterclaims relate to Phase 1A. WFC seeks $117,527.11 that it allegedly spent to complete and/or repair RMC's work on Phase 1A after it terminated RMC's Phase 1A contract (a termination discussed below). (The Court herein generally follows the parties' practice of referring to (i) work done by the substitute contractor to complete work left undone by RMC as "takeover" or "completion" work; and (ii) work done allegedly to fix purported

---

[4] As discussed below, the Court does not know why RMC (unlike WFC, actually) subtracted the five-percent retainage from the gross amount stated in the Fee Applications, rather than making a claim in this litigation for the entire gross amount with no offset for expected retainage. Because WFC never paid these claims, it never kept the five-percent retainage for them, and therefore such retainage was not included in the above-referenced retainage figures ($100,609.04 and $370,270) that RMC has claimed separately. Therefore, by claiming the gross amount of the figures in these two Fee Applications, without a reduction for retainage, RMC would not have been seeking a double recovery of the retainage, and thus it seems that RMC could and should have claimed the entire gross figure for those Fee Applications.

[5] September 29, 2017 is the date of RMC's last Fee Application. **(P-21)**.

problems with work RMC did do as "repair" work). As a result, WFC claims that it owes RMC

nothing with respect to Phase 1A. To the contrary, WFC contends that the remaining Phase 1A

retainage of $100,609.04 was more than absorbed by WFC's offsets. (P-31; D-332).[6]

As for Phase 1B, WFC claims consequential damages allegedly stemming from RMC's

alleged breaches of the Phase 1B contract. Specifically, WFC contends that to complete and/or

repair work RMC was required to perform in Phase 1B, it (WFC) spent $3,992,878.48, which it

breaks down as follows:

- Kelchner completion/takeover work as initially priced    $ 739,690.87
- Expanded completion/takeover work    $ 1,501,843.60
- Repair work paid to Kelchner    $ 1,540,916.98
- Repair work paid to a third party other than Kelchner    $ 210,427.03

(P-31; D-332). WFC seeks to recover these amounts as well. So in connection with alleged
breaches of contract in connection with both Phases, WFC seeks to recover a total of
$4,110,405.59, minus appropriate offsets, which it concedes includes the (i) combined retainage it
has held onto (plus applicable interest); (ii) the (gross) amount of the two pay applications;[7] and
(iii) the "unbilled" amount of Phase 1B in the amount of $501,994.23.[8] (*Id.*).

---

[6] Herein, generally, citations to a trial exhibit of WFC will be to "P-___," and citations to a trial exhibit of WFC will
be to "D-___").

[7] WFC actually puts the amount of the two pay applications as somewhat higher than does WFC; WFC puts
the amounts at $536,668.23 and $229,522.30. (D-332). This appears correct to the Court. Apparently, RMC
sold itself short; the figures that RMC stated for the amount claimed in the final two Fee Applications were
*net of retainage;* it subtracted from the gross amounts claimed in those Fee Applications the amount (5
percent of the gross amount) that WFC would have held as retainage had it paid on those applications. The
Court cannot discern why so doing would be necessary, and WFC apparently does not believe that so doing
is necessary. And so, consistent with WFC's approach and to RMC's benefit, the Court uses the higher
(gross) amount for those claims, $536,668.23 and $229,522.30.

[8] At trial, it was made clear that by "unbilled," WFC meant the amount left in the Phase 1B contract. As
noted above, the amount left in the contract is the face amount of the contract (as amended), minus what
had previously been paid on the contract, minus retainage that had been withheld on the contract, minus
amounts that had properly been billed on the contract but not yet been paid. The Parties were in agreement
about the amount held in retainage on the Phase 1B contract ($370,270), and it appears that they also agreed
about what the face amount of the contract (as amended) was. What they disagreed on was what amount
had been properly billed and yet remained unpaid. Notably, it is clear that RMC initially contended that
given its view that all amounts in its final two Fee Applications were properly billed, the amount left in the
Phase 1B contract was $852,553.47, (P-21 at 1), minus retainage of 370,270. (Tr. 3.97:23-25). This amount
would, of course, amount to $482,283.47. Fostering confusion, however, counsel for RMC kept referring

to this figure as "490 [thousand dollars]." (Tr. 3.97:1-2, 97:25, 104:11-12). Ultimately, it fell to the Court to clarify that the reference to "490 [thousand dollars]" was a reference to RMC's asserted figure of $482,283.47. (Tr. 3.150:2-14). Also, counsel for RMC dubiously referred to WFC's witness (Mr. Foust) as having instead stated a figure of "500,000" by virtue of "rounding up" that purported $490,000, (Tr. 3.97:23-25), when actually it is far more likely that the witness was using the figure of $500,000 because, as noted below, it was WFC's position was that the figure of $852,553.47 was roughly $19,000 too low, thus taking RMC's (actual figure) of roughly $482,000 to roughly $501,000.

In contrast to RMC's figure of $482,283.47, WFC asserted a figure of $501,994.23. (D-332). While agreeing with RMC that the retainage figure was $370,270, RMC's counsel asserted that the figure of $852,553.47 was approximately $19,000 too low, and that instead the correct figure was approximately $871,000. (Tr. 3.153:3-8). As noted briefly below, WFC's assertion of this higher figure is a double-edged sword; if accepted by the Court, it would be (a) helpful to WFC in lowering by roughly $19,000 the amount potentially to be awarded RMC on its final two Fee Applications; but (b) helpful to RMC by providing RMC an offset to WFC's claims roughly $19,000 greater than the offset would be under RMC's figure. Ultimately, counsel for RMC essentially agreed to the use of WFC's number, stating that he "like[d]" it because it "means there was a larger monetary amount left in the contract to [go towards the cost of] complet[ing] it." (Tr. 3:153:14-17). Therefore, the Court treats WFC's figure as correct by mutual assent. Regrettably, in their respective Proposals, the parties do not use that figure; instead, WFC's figure morphed to $490,296.25, (Doc. No. 111 at 38), while RMC claimed (incorrectly) that "[i]t was not disputed that the value left in RMC's contract to complete Phase 1B totaled $482,283.47." (Doc. No. 110 at 17).

It seems to the Court that WFC's ongoing view that the amount left in the contract is higher than what RMC claims must be based on the notion that RMC's final two Fee Applications are not actually payable in full but rather should be discounted (albeit only by a relatively minor amount); if they were payable in full, then in the Court's view there would be no basis for a discrepancy in the two sides' view as to the amount left in the Phase 1B contract. But since WFC evidently believes that the two Final Fee Applications are not payable in full, one wonders why it has conceded that they are payable in full. (D-332). The Court cannot answer this question. But it resolves this discrepancy in RMC's favor, by treating WFC as conceding both that the Final Two Fee Applications are payable in full and that there was more left in the Phase 1B contract at the time of its termination than actually would have been the case were both of the final Fee Applications actually payable in full.

The undersigned does not mean to be flippant when he says that, having earned an undergraduate electrical engineering degree, he understands and is comfortable with computation. But he has been challenged because at times one or both of the Parties have been incorrect, imprecise, inconsistent, and/or hard to pin down regarding what a particular figure is or should be (and also, sometimes, why the figure should be what supposedly it should be). Even though the Court does not want to lose the forest for the trees in making its findings of facts and conclusions of law, the reality is that it needed to resolve, often at considerable effort, even relatively minor discrepancies regarding certain numbers, lest the Court's own figures be all over the place, or the Court have legitimate fears that a potential inability to resolve a discrepancy could be the result of fundamentally misunderstanding something about the claims and the evidence, and lest the Court miss something important that might be obscured via an unresolved discrepancy in particular figures. The confusion engendered by the Parties about various figures was a major problem for the Court and is one of the things that has caused such a regrettable delay in the issuance of these findings of fact and conclusions of law. On the other hand, generally the Court otherwise credits the Parties and their counsel for how they have handled this litigation.

The Court offers this word to the wise: in a busy court like this in a case like this, with its huge number of exhibits, claims, counterclaims, offsets, etc., litigants whose priority is receiving a decision with anything close to reasonable promptness would be well-served to strongly consider proceeding to a trial by jury. Parties have the right to waive a jury, but that triggers the obligation for written findings of fact and conclusions of law by the presiding judge, which in a case like this can take an immense amount of time to

WFC also seeks "delay" damages from RMC. Specifically, it contends that although its sales projections were met, those respective sales did not materialize until a number of months after the date WFC projected that they would arrive. As a result, WFC seeks "delay damages" for the following amounts:

- $ 84,250.00   Liquidated damages
- $ 2,111,881.00   Delays, calculated at a 15% rate of return
- $ 356,049.16   Loan interest
- $ 215,115.15   Loan closing costs
- **$ 2,767,295.31**   **Total**

(P-31; D-332).[9]

_____

prepare, especially given the Court's continuous stream of conflicting, time-sensitive priorities. To their credit, given their patience, counsel seem to fully understand this.

[9] Plaintiff's (i.e., RMC's) Exhibit 31 (P-31) is actually a document created by WFC; namely, it was WFC's Rule 1006 Summary of Defendant's alleged damages. Perhaps for this reason, in several places in RMC's Proposal, P-31 is erroneously referred to as "D-31." (Doc. No. 110 at 5, 19, 25). Notably, P-31 is the same document as Defendant's (i.e., WFC's) Exhibit 332, a document that counsel for WFC used in his opening statement. (Tr. 1.16:10–22:22), and a document that was offered separately by WFC and admitted. So the citation to this summary of damages claimed by WFC ("Summary") is to both P-31 and D-332. During its opening statement, counsel for WFC represented the Summary to be an accurate accounting of what Defendant is claiming as net damages for numerous damage categories and in total. Accordingly, the Court uses the Summary as a guide for tracking and sifting through WFC's claims for damages of various types (just as RMC does in RMC's Proposal). Where WFC's Proposal suggests slicing and dicing the damages a different way, the Court declines to go along with that suggestion (the adoption of which would both be unfair to RMC, which naturally defended this case and drafted RMC's Proposal with an eye on the Summary in particular, and would serve to inject considerable complication into what is already a very difficult task for the Court) and instead follows the roadmap provided by the Summary. Of course, the Court is fully cognizant that the Summary supports WFC's claims for damages only to the extent that there is evidence to back up the figures on the Summary.

So, for example, the Summary indicates that WFC's damages in completing and repairing RMC's work on Phase 1A were $117,527.11, broken down as $42,285 for completion costs paid to Wood, $43,628.59 paid to Goodwin, and 31,613.52 for repair paid to Goodwin. But in WFC's Proposal, confusingly, it states the figure as $67,119.30, with a breakdown not traceable in any way to what is in the Summary. (Doc. No. 111 at 35). But WFC also seemingly suggests that at least some of the approximately $50,000 difference between the two figures is attributable to the curb-repair costs (paid to Goodwin) that cannot be allocated between Phase 1A and Phase 1B. (_Id._). WFC suggests that such curb-repair costs be awarded even though they plainly do not fit into any of the damages categories in terms of which it induced RMC and the Court to think in terms. So what is a busy court to do in order to make some sense of this kind of situation, in a single case having well over a thousand pages in the trial transcript and hundreds of admitted exhibits the trial record, with dozens of categories of damages total asserted by the two sides? The best it knows how to do. Here, with respect to Phase 1B, that means assessing WFC's claimed damages by

The claims and counter-claims of RMC and WFC were tried without a jury on December 14, 15, 17, 17 and 22, 2021. By agreement of the Parties, WFC presented its case-in-chief first, as if it were the plaintiff rather than the defendant/counterclaimant as is actually the case.

<u>FINDINGS OF FACT</u>[10]

RMC accurately summarizes the witnesses that it presented as follows:

- **Mike Johnson** – RMC Shareholder, Director and Officer

- **Ray Mosley** – RMC Shareholder, Director and Officer

- **Alan "Red" Keiser** – Former Project Manager for Kelchner/Wood.  Mr. Keiser testified pursuant to a <u>Subpoena</u>.[11]

- **Danny Miller** – Chief Inspector for the White House Utility District.  Mr. Miller testified pursuant to a <u>Subpoena</u>.

_____

reference to the categories in terms of which WFC expressly presented its claims in the Summary. By contrast, as to Phase 1A, given that there is less complexity and confusion (and far less disagreement between the parties) engendered by the new damages figures listed in Defendants' proposal, the Court will use those figures (which total $67,119.30, but should actually be $45,285.00 because Defendant here double-counted $21,834.30).

    As for the curb-repair costs, the Court declines to award them. They represent alleged damages from the alleged breach of two different contracts. The Court simply does not see how it can award a combined sum for breach of two different contracts without any indication of what damages flow from the breach of which contract. The same is true for alleged damages in the form of costs to clean curbs and silt bags, which WFC represents "cannot [be] isolated as pertaining solely to one Phase or the other." (Doc. No. 111 at 35).

[10] These findings of fact are in some places taken verbatim, or with slight paraphrasing, variously from RMC's Proposal and from WFC's Proposal. The Court notes that some of the content in these findings of fact are not "findings" as such, but rather discussion that serves to put in context those things that actually are findings; some of the "non-findings" included herein are in the nature of an identification of what a party or witness has asserted (but that the Court does not necessarily find to be true or accurate). The Court notes further that its actual findings are identifiable because they are statements herein regarding the underlying facts of this case that are either (i) made without any qualification; or (ii) prefaced by language along the lines of "the Court finds."

[11] RMC explains (albeit with an incorrect citation to pages 135-142 in Volume 5 rather than pages 135-142 in Volume 4 of the transcript), "Mr. Keiser was the Project Manager for Kelchner in connection with its multiple contracts with WFC to perform work on Durham Farms Phases 2 and 3; and Kelchner's takeover work on Phases 1A and 1B." (Doc. No. 110 at 5 n.5).

- **Lucas Norris** – Former Project Manager for RMC. Mr. Norris testified pursuant to a <u>Subpoena</u>.

- **Caleb Unland** – Former Project Superintendent for RMC. Mr. Unland testified pursuant to a <u>Subpoena</u>.

(Doc. No. 110 at 5). And RMC accurately notes also that "WFC relied on the testimony of three (3) employees of its management company [Freehold], including Raymond Smith, Thomas Foust and Stanley Brown [and of] a non-party, the engineer, Jerry Gammon." (*Id.* at 6).

## A. The Parties' Contracts for Phase 1A and Phase 1B, Respectively

RMC is a now-defunct horizontal-construction[12] and hauling business. It ceased operations in the wake of its termination from the projects at issue in this case and no longer carries on any business. WFC is a holding company for the Durham Farms subdivision. The subdivision is a development project of a national real-estate firm known as Freehold Capital Management [Freehold]; WFC has no employees of its own, but rather contracts with Freehold to meet its personnel needs. (*See* Tr. 3.195:1–196:6, 199:6–18). [13]

---

[12] The term "horizontal-construction" is used, as an adjective, in WFC's Proposal. Although not used in RMC's Proposal, it is a term that the Court finds appropriate to describe the services that RMC was providing. As one source puts it (consistent with how other sources put it), "'horizontal construction' means the construction of any fixed work, including any irrigation, drainage, water supply, flood control, harbor, railroad, highway, tunnel, airport or airway, sewer, sewage disposal plant or water treatment facility and any ancillary vertical components thereof, bridge, inland waterway, pipeline for the transmission of petroleum or any other liquid or gaseous substance, pier, and work incidental thereto. The term does not include vertical construction, the construction of any terminal or other building of an airport or airway, or the construction of any other building." *Horizontal Construction*, LAW INSIDER DICTIONARY, *https://www.lawinsider.com/dictionary/horizontal-construction*. By contrast, "'vertical construction' means the construction or remodeling of any building, structure or other improvement that is predominantly vertical, including, without limitation, a building, structure or improvement for the support, shelter and enclosure of persons, animals, chattels or movable property of any kind, and any improvement appurtenant thereto." *Vertical Construction*, LAW INSIDER DICTIONARY, *https://www.lawinsider.com/dictionary/vertical-construction*.

[13] Herein, the Court cites to the trial transcript as "Tr.," and variously cites it by volume number followed by a period followed by page number followed by a colon followed by the beginning line number followed by a dash followed by the end line number (which may or may not by identified as being on a subsequent page number).

As planned, Durham Farms is a planned-urban development of 1201 units. (Tr. 1.39:23–40:5). The Parties[14] entered into two contracts with respect to Durham Farms. The first, dated October 23, 2014, called for horizontal-construction services in what was termed "Phase 1A" of the "Durham Farms" subdivision in Hendersonville, Tennessee. (D-1). The second, dated April 25, 2016, called for the same horizontal-construction services in what was termed "Phase 1B" of the same subdivision. (D-2).

The Durham Farms plan divides its total area into both "phases" and "sections." A section generally consisted of roughly one or two blocks of residential lots, although in limited cases a particular street or common area was assigned its own section. (*See* D-7). Multiple sections were grouped together in phases. (*See id.*; Tr. 1.64:17–65:1). In addition to Phases 1A and 1B (the respective objects of the Parties' two contracts), the subdivision also extended to Phases 2 and 3. (Tr. 4.139:9–19).

Phase 1A included Sections 1, 2, 3, 4, and 5. (D-7). Phase 1B included sections 6 through 23; one of those sections, Section 16, was subsequently deleted from RMC's contract for that phase. (*See* Tr. 1.72:9–11). Both contracts attach an "Exhibit B" outlining the scope of RMC's work. Pursuant to the respective Exhibits B, RMC was required to deliver ready-to-build lots with accompanying roads, utilities, and other infrastructure in the respective Phases. (D-1 at 32; D-2 at 33; *see also* Tr. 1.82:24–83:25). A major component of RMC's work under both contracts was the installation of subterranean utilities and the subdivision's stormwater-drainage apparatus. (D-1 at 32; D-2 at 33; D-8).

---

It bears mentioning that due to the undersigned's error in referring at trial, without being corrected, to the exhibit as "Defendant's" Exhibit 30, (Tr. 2.177:3-9), the applicable transcript refers to what is actually is *Plaintiff*'s Exhibit 30 (P-30) as *Defendant*'s Exhibit 30 (D-30). (Tr. 2.5:18; 177:10-11).

[14] Herein, "the Parties" refers to WFC and RMC, to the exclusion of Philadelphia Indemnity.

The contracts, consistent with local regulatory requirements, required the utilities and stormwater installation to be installed so as to secure the approval of the appropriate jurisdictional authorities. (D-1 at 32; D-2 at 33). There were at least three such authorities for Durham Farms: the White House Utility District for sanitary sewer and water, Cumberland Electric Company for electrical lines, and the City of Hendersonville for stormwater. (Tr. 1.69:9–70:17).

Each contract also contained a schedule of values describing the line items of work to be performed on the project and the amount, or rate, to be paid therefor by WFC. (D-1 at 41–51; D-2 at 43–48.) Each contract was a fixed-sum contract; that is, if the work took longer, or required more workers or materials than originally estimated or set out on the schedule of values, RMC was not entitled to additional compensation unless the Parties agreed to modify the contract. (*See* D-1 ¶¶ 4.1, 4.2.2; D-2 ¶¶ 4.1, 4.2.2).

Although the contracts' schedules of values itemized the required work, they did not do so with great specificity. That is, there were frequently multiple steps or tasks required in performing any given line item. (D-30; Tr 1.152:12–153:8).

The contracts also established completion deadlines. The Phase 1A contract required RMC to achieve substantial completion of the work under it within 210 days of being given notice to proceed by WFC. (D-1 ¶ 2.3). The Phase 1B contract required RMC to achieve substantial completion of the work under it within 412 days of being given notice to proceed. (D-2 ¶ 4.2; *id.* at 82).

The Phase 1B contract likewise established interim milestones, pursuant to which RMC was required to have progressed to certain points in the work by specified dates. (D-2 at 82).

Under each contract, RMC could claim an extension of the deadlines on account of inclement weather, but only by submitting a supported application and weather log showing the conditions that warranted an extension. (D-1 ¶ 10.4; D-2 ¶ 10.4).

Both contracts provided that RMC would be paid at intervals according to its progress and in response to verified applications for payment, and both contracts authorized WFC to withhold from each payment as retainage five percent of the amount otherwise due. (D-1 ¶ 4.2.4; D-2 ¶ 4.2.4). The retainage was to be held in escrow pending final completion and approval of the work. (D-1 ¶ 4.2.4; D-2 ¶ 4.2.4; Tr 5.16:21–18:12).

RMC's work on Phase 1B ran behind schedule and suffered numerous defects. RMC was given notice to proceed under the Phase 1B contract on May 17, 2016. (Ex. D-6 at 3). RMC came to be "extremely behind" schedule on Phase 1B pursuant to the milestone provisions in the Phase 1B contract. (Tr. 1.60:7–10). RMC met the first milestone in the Phase 1B contract, which required that a water line closing a connection in Phase 1A be completed within 120 days of commencement. (Tr. 1.82:14–23; D-2 at 82). But RMC failed to meet the deadlines on milestones 2, 3, 4, and 5. (Tr. 1.84:1–24). By the deadline for milestone 6, focusing on Section 16, RMC had not even begun most of the work in that section; the parties subsequently executed a change order that removed Section 16 from the scope of RMC's Phase 1B contract. (Tr. 1.84:25–85:5). RMC did perform a small amount of initial work in Section 16, largely on sewer installation. (Tr. 1.71:6–22).

RMC suggests, and there was some testimony to the effect, that the defects found in its work on Phase 1B were of a type commonly experienced in horizontal-construction jobs. But the Court does not find the fact that such defects may be common dispositive. First, the evidence clearly established that the volume and rate of defective work in Phase 1B was substantial. Second,

even witnesses who testified that such defects had been seen before or seen on many jobs testified that the rate of defects in the Phase 1B work was unusually high. Third, commonality (of defects) is not the applicable standard; RMC was required to complete the contracted-for undertakings in a "good and workmanlike manner, and with the degree of care and skill required," (D-1 ¶ 7.9; D-2 ¶ 7.10),[15] and commonality is not the standard under Tennessee law for workmanship or reasonable care. Moreover, RMC admits that WFC properly terminated the Phase 1B contract for cause. (Tr. 4.19:16–23). Under the proof presented, such "cause" could only have been a material breach of the Phase 1B contract as specified in paragraph 18.1 therein. (Ex. D-2 ¶ 18).[16]

## B. Termination of the Contracts

On October 12, 2017, WFC terminated both the Phase 1A contract and the Phase 1B contract. (D-3; D-4). WFC had cause under the Phase 1B contract to terminate it for cause, and WFC properly did so. (Tr. 4.19:16–23).

## C. RMC's Claims[17]

### 1. Phase 1A: Retainage

During the course of RMC's work on Phase 1A, WFC held back a portion of RMC's Fee Applications, as retainage. The retainage balance grew to $353,124.96. (P-17). As RMC was

---

[15] The Court herein generally uses the term "workmanlike" for short as describing the overall standard of work that RMC was required to meet under the term of the contract, including "free from defects." Conversely, it generally uses the term "unworkmanlike" for short to describe work that falls short of that standard.

[16] The Court touches on RMC's performance issues here because those issues are related what the Court is covering right here, i.e., the overall nature and history of the Parties' contracts (especially the Phase 1B contract). The Court addresses RMC's performance issues in much mor detail below.

[17] For multiple reasons, the Court found this a case in which it was unusually difficult to pinpoint an ideal place to insert a detailed discussion of the applicable claims. The Court has concluded that including that discussion right here is the best option even if this initially appears to place the discussion somewhat out of order.

winding up its work on Phase 1A, WFC released to RMC the great majority of that retainage, reducing it to only $100,609.04. (*Id.*). WFC never released the balance of those funds to RMC. RMC asserts a claim for that retainage, plus statutory penalties, interest and legal fees under the Tennessee Prompt Pay Act (Tenn. Code Ann. §66-34-101, *et seq*.) based on WFC not releasing it to RMC.

2. Phase 1B: Retainage: During the course of RMC's work on Phase 1B, WFC held back a portion of RMC's Fee Applications totaling $370,270, as retainage (P-17). WFC never released any of those funds to RMC. RMC asserts a claim for that retainage, plus statutory penalties, interest and legal fees under the Prompt Pay Act based on WFC not turning it over.

Fee Applications: Prior to being terminated by WFC as the contractor (as discussed below), RMC sent multiple Fee Applications to WFC. WFC paid all of those Fee Applications except for the last two (2), which were as follows:

- Fee Application for Phase 1B dated 08/31/17 for $509,834.82 (P-20); and

- Fee Application for Phase 1B dated 09/29/17 for $218,046.19 ( P-21).

WFC never paid those Fee Applications, so RMC seeks a judgment against WFC in the total amount of $1,198,770.05 (P-26).[18] As indicated above, RMC also seeks pre-judgment interest from September 29, 2017, as well as fees and penalties under the Prompt Pay Act. (P-21).[19]

## D. WFC's Claims

WFC filed a counter-claim with multiple aspects to it. A summary of that counter-claim is as follows:

---

[18] This amount comprises the sum of the remaining retainage for both phases and the two unpaid fee applications.

[19] September 29, 2017 is the date of RMC's last Fee Application. (P-21).

1. Phase 1A

WFC contends that it spent $117,527.11 to complete and/or repair RMC's work on Phase 1A after it terminated RMC's Phase 1A contract (a termination discussed below). (The Court herein generally follows the parties' practice of referring to (i) work done by the substitute contractor to complete work left undone by RMC (as so-called "takeover" or "completion" work); and (ii) work done allegedly to fix purported problems with work RMC did do (as so-called "repair" work)). As a result, WFC claims that it owes no money to RMC regarding Phase 1A. WFC contends that RMC's Phase 1A retainage of $100,609.04 was more than absorbed by WFC's offsets. (P-31; D-332).

2. Phase 1B

At trial, RMC asserted that at the time WFC terminated Phase 1B, the amount "left"[20] in the Phase 1B contract (and thus available to pay at least in part for the remaining the work on Phase 1B that RMC had agreed to complete) totaled $482,283.47. This is calculated as the entire contract amount minus amounts previously and properly billed by RMC—here meaning a difference of $852,553.47, (P-21), *if* the amounts billed in RMCs two outstanding fee applications were proper—minus retainage on Phase 1B of $370,270. (*See* P-17). WFC did not seem to dispute at trial that $482,283.47 is the correct figure for the amount left in the contract, *except* insofar as WFC contends that the final two fee applications billed for things that should not have been billed and thus were excessive in amount. The balance left in the contract is *properly* pegged at $482,283.47 only if one assumes that RMC's two unapproved fee applications (the combined

---

[20] In referring to the balance (amount) "left" in the contract or "remaining" in a contract, the Parties appear to mean, essentially, the entire contract price (as amended, to the extent that the contract has been amended), minus amounts that had been properly billed by the contractor (and thus have either been paid to the contractor, withheld from the contractor as retainage, or not yet been either paid or treated as being withheld as retainage).

amount of which is necessary to bring the balance left in the contract down to $482,283.47) were correct, i.e., were appropriately subject to approval in the amounts stated in the applications.

WFC neither assumes nor concedes any such thing. To the contrary, it asserts that the figure in RMC's final pay application was inaccurate, thus rendering inaccurate RMC's figure of $482,283.47 for the amount left in the contract. Specifically, WFC contends "that RMC had billed for—and thus its [final] pay application reflected as complete—work that had not been performed in full." (Doc. No. 111 at 50). This contention—made by WFC to contest that it actually is liable for the entire amount of the final fee application—has the collateral and converse effect of suggesting that the amount in the final fee application (being too large, according to WFC) served to incorrectly *lower* the amount left in the Phase 1B contract. In other words, by WFC's reasoning—whereby the amount of RMC's final fee application is too large, there was actually more than $482,283.47 remaining in the Phase 1B contract.

As for what that amount is, as noted in a lengthy footnote above, the Parties mutually agreed at trial to use WFC's figure, *i.e.,* $501,994.23. (D-332). But even using that higher amount, WFC contends that there still was not nearly enough money left in RMC's contract to actually complete the remaining work on Phase 1B that RMC had agreed to completed, contrary to RMC's assertion that such completion could have been completed for the amount left in the contract.[21] In other words, WFC disputes that the work could have been completed for the amount left in the contract—whether that amount be $482,283.47 as contended by RMC, or some higher figure as WFC implies (by contending that RMC's final fee application was too high). This is because, according to WFC, such completion required much more additional work than RMC claims was required. For one thing, according to WFC's suggestion, there was still work to do that RMC

---

[21] Consistent with RMC's position in this regard, Mr. Norris testified that he thought such work could have been completed for the amount left in the contract. (Tr. 5.45:17-20).

represented (in its final fee application) had been completed. Additionally, according to WFC, there are other reasons why it is clear that RMC was greatly understating the work required for completion and thus the cost of completion.[22] As WFC put it:

> RMC's former employee (and RMC's trial witness) Norris also admitted [at trial] that while its budget would have had room for "some remedial items," RMC could not have excavated all of the sanity-sewer laterals in Section 6, or in Sections 8 through 11 and 17 through 20. (Tr. 5.91:24–92:5). He also admitted that the bid RMC submitted—and thus the amount left remaining in its contract after its final payment application—did not contemplate the expense of removing entire manhole structures after they had been installed and paved over (which, WFC implies, is work that RMC was contractually obligated to perform even if it did account for that in the contract amount it agreed to accept). (Tr. 5.94:13–25). He admitted that RMC's bid—and thus the amount left remaining in its contract after its final payment application—did not contemplate replacing curbs that were damaged during the construction process. (Id. at 95:9–16). Nor did the amount remaining in RMC's Phase 1B contract include costs for replacing Misty Way and Edenburg Drive.

(Id.). RMC's final pay application represented that RMC's contracted work on Phase 1B was 94.89 percent complete, (P-21; Tr. 5.87:24–88:2), and Norris admitted that if that percentage figure was too high, then the cost of completion would be higher than RMC contended. (Tr. 5.88:8–11).

WFC contends that to complete and/or repair remaining work in Phase 1B, it spent $3,992,878.48, which it breaks down as follows:

- Kelchner completion/takeover work as initially priced    $ 739,690.87

- Expanded completion/takeover work    $ 1,501,843.60

- Repair work paid to Kelchner    $ 1,540,916.98

- Repair work paid to a third party other than Kelchner    $ 210,427.03

---

[22] RMC's litigative position has been that the amount left in the contract was sufficient at the time of RMC's termination to complete the work required of RMC under the Phase 1B contract; this also was the position taken by Norris during his testimony. (Tr. 5.88:3-7).

(P-31; D-332). WFC asserts that RMC is liable for these amounts. Before addressing the extent to which that assertion is valid, the Court notes that it finds that WFC actually spent these amounts.

WFC also seeks "delay" damages from RMC. Specifically, it contends that although its sales projections were met, those sales did not materialize until 8 months after the date WFC projected that they would arrive. (*See,* Brown testimony, below). As a result, WFC seeks "delay damages" for the following amounts:

- $ 84,250.00 Liquidated damages
- $ 2,111,881.00 Delays, calculated at a 15% rate of return
- $ 356,049.16 Loan interest
- $ 215,115.15 Loan closing costs
- **$ 2,767,295.31 Total**

( P-31; D-332).

### E. The Parties' Respective Performance Under the Phase 1A contract[23]

RMC commenced work pursuant to the Phase 1A contract shortly after its execution. RMC successfully and properly (though not timely, as discussed below) performed much of the work required under the Phase 1A contract. But as discussed below, there were several issues regarding RMC's work that were extant around the time of the termination of the Phase 1A contract.

For one thing, Paragraph 4.4.2.1 of the Phase 1A contract unambiguously requires that all work requiring governmental approval be approved before Phase 1A is "Substantially Complete" within the meaning of the agreement. (D-1). RMC was required by the Phase 1A contract to install

---

[23] It is in this section, the Court realizes, that it is especially susceptible to a charge of including conclusions of law in a section ostensibly devoted to findings of fact. But the Court finds that efficiency concerns dictate including in this section everything it has included, as opposed to deferring some such content until later on the grounds that it may contain conclusions of law.

a concrete drainage culvert (also known as the "swale" or "Ditch C") near the entrance to the subdivision (in Section 1). There was no dispute among the witnesses or the documentary evidence that the entrance culvert required governmental approval from the City of Hendersonville and that it remained uninstalled (and therefore of course unapproved) by the time of termination in October 2017. (Tr. 1.37:8-14; Tr 3.109:12–25, 118:2–119:10; D-30).

Although there was testimony at trial to the effect that Phase 1A was "substantially complete" in October 2017, the Court finds otherwise based on the weight of the evidence. RMC never achieved "Substantial Completion" on Phase 1A as that term is used in the Phase 1A contract, if for no other reason than RMC failed to install and secure approval of the drainage culvert (a/k/a "swale"). Moreover, there was photographic evidence that demonstrated RMC's failure concerning the drainage culvert was not merely technical. Exhibit D-216 shows the area where the culvert was omitted: large drainage pipes empty into that space, and in the absence of the specified culvert, standing water remained in a swamp-like condition next to the pipes. (Tr. 1.131:3–10). A similar condition in the same area is seen in Exhibit D-217. (*See* Tr. 1.131:18–24). The failure to install the swale constituted a material breach of contract. Citing Exhibit D-80, WFC claims that damages for such breach included $21,834.30 paid to Kelchner for work installing the swale. (Doc. No. 111 at 34). Fair enough. But then WFC, citing *only* page 1 of Exhibit D-8 (not D-80), claims an *additional* $33,405.00 paid to contractor RT Goodwin for its work in installing the swale. (*Id.*). The problem is that the cited page of Exhibit D-8 supports only the notion that the *combined* bills of Kelchner and RT Goodwin for this swale-installation work amounted to $33,405.00. For all the Court can determine, therefore, the $21,834.30 billed by Kelchner was claimed twice by WFC. The Court hopes and expects that WFC did not intentionally double-claim the expense of Kelchner's work, but there is a substantial problem here in any event; WFC either

did exactly that or failed to establish that RT Goodwin billed $33,405.00 (as opposed to $33,405.00 *minus* $21,834.30). Ultimately, the record supports an award of damages to WFC with respect to the swale installation in the amount of **$33,405.00**—no more and no less.

There was extensive testimony during the trial concerning the necessity of protecting subterranean installations from the accumulation of mud and silt during a construction process. Witnesses for both sides agreed that such protection was an obligation of a contractor such as RMC. (Tr. 1.54:18-55:16; Tr. 4.61:5–14, 212:12–15). The question of work protection became prominent in Phase 1B. (Tr. 1.57:24–58:14, 71:6-73:1). But it was relevant to an extent in Phase 1A. During the construction process, mud and silt accumulated in the previously mentioned large drainage pipes in Section 1, blocking approximately a third of the passage. RMC was responsible for cleaning out the pipes, but instead of jetting all of the mud and silt out of the pipes so as to clear the passage, RMC merely dug out a few feet from the entrance on each side. (*See* D-215; Tr. 3.169:2–20; Tr. 1.124:5–125:1). Thus, the evidence established that RMC breached its obligation to keep mud out of the pipes adjoining the swale; the damages to WFC from this (material) breach of contract were **$3895.00**, which is what WFC paid Kelchner to clean the mud of out the pipes.

The Court concludes, consequently, that RMC's performance of the Phase 1A contract was both untimely and unworkmanlike to encompass the notion of with respect to the culvert and drainage pipes near the entrance to the subdivision.

Additionally, citing primarily but not exclusively Exhibit D-8, WFC claims $6,345.00 billed by Kelchner to repair a roadway from trench failure. The Court reviewed and admitted seventeen video clips recorded immediately following RMC's termination in October 2017. (D-161; D-162 (part 18)). One of these videos showed, when viewed in connection with testimony from Mr. Ray Smith, that RMC had excavated a four-foot utility trench in Section 5, left the trench

open, and failed to mark and protect the trench with fencing. (Tr. 2.107:2–108:18). The trench was opened, or left open, a significant time after RMC had completed its other work in Section 5, as houses had been constructed and were occupied in that section in October 2017. (*Id.*; D-161). The Court concludes, based on Mr. Smith's testimony and the video itself, that RMC's failure to backfill or protect the trench in Section 5 constituted defective workmanship and a violation of the Phase 1A contract. (*See* D-1 ¶ 9.1). So the Court treats this **$6345.00** as awardable to WFC.

Citing Exhibit D-8 and D-81, WFC also claims $1,640.00 billed by Kelchner to install risers on Phase 1A storm structures. As discussed below, RMC does not seem to dispute that this amount (or, for that matter, any of the other three amounts just mentioned) is appropriately awardable/creditable to WFC, and the particular figure asserted is supported by the record. So the Court treats the **$1640.00** as awardable. Combining the four awardable items, the total damages awardable on WFC's counterclaim with respect to Phase 1A is **$45,285.00**—an amount that offsets to an extent RMC's claim for recovery of retainage on Phase 1A.

In light of RMC's failure to correct the omission of the drainage culvert ("swale") promptly and the totality of the circumstances, WFC acted reasonably in terminating the Phase 1A contract and retaining a substitute contractor to complete the remaining Phase 1A work. Notably, at the time of termination WFC was withholding (and indeed to this very day still is withholding, as far as the Court is aware) $100,619.04 in retainage for the Phase 1A contract.

A final issue related to the angle of elevation of certain sewer pipes installed in Section 1 by RMC. It was clear from the evidence that RMC installed certain drainage pipes at the wrong elevation. (Tr. 3.170:21–175:10; D-244; D-177; D-215; D-217). Based on the (reportedly incorrect) angle of elevation, the City of Henderson (the approving municipal authority for this component of the work) potentially could have rejected the work and required that they be

reinstalled at a different (correct) elevation. (D-244). WFC's witnesses estimated that it would

have cost around $95,000—with WFC's precise estimate being $95,580 (Tr.3.124:22-125:11)—

to raise the pipes to the proper elevation had this been required, and this estimate was not disputed

by other witnesses. (Tr. 3.174:20-175:10). And for several years, it was not clear that reinstallation

of the pipes would not be required.

But by the time of trial in December 2021, the risk of the City of Hendersonville requiring

reinstallation had entirely dissipated, with the pipe installation having effectively been approved

(by negative implication) months earlier. The City of Hendersonville never did affirmatively state,

in writing or orally, that reinstallation of the pipes would not be required; instead, the fact that

reinstallation would not be required became clear when the new Director of Public Works (Sarah

Lock) orally conveyed to WFC in the summer of 2021 that Section 1 was approved. (Tr. 3.181:15–

184:6). Because the City of Hendersonville did not in fact reject the pipes and require their

elevation be changed, the Court finds that RMC's pipe installation does not constitute a material

nonconformity with the specifications in the Phase 1A contract. But because WFC did not obtain

approval for this apparatus until summer 2021, it acted reasonably in retaining (at the time of

termination of the Phase 1A contract) funds in an amount up to $95,580 to potentially address this

issue (even though funds were never actually spent for this purpose).[24]

However, the retention of such funds became unreasonable (and thus also not "in

accordance with" the Prompt Pay Act, as discussed below) once it became clear that WFC would

not need to spend funds to address this issue. Indeed, Mr. Foust had told Mr. Norris, in an email

dated July 20, 2017, that once this issue was resolved with the City of Hendersonville, "we will

---

[24] Whether a contractor's withholding of retainage is "reasonable" is a question that is consequential under
the Prompt Pay Act (in particular Tenn. Code Ann. § 66-34-303), as discussed below.

release the remaining [approximately] $100,000 [in retainage on Phase 1A]." (P-19). As noted above, this issue was resolved with the City of Hendersonville in the summer of 2021. (Tr. 3.183:9–184:4; 190:12–191:5). And yet the retainage was not released at that time; indeed, WFC never did release *any* of the approximately $100,619.04 in retainage—not even a lesser amount (ultimately revealed to be $55,324.04)[25]—reflecting a reduction for any appropriate offsets against that retainage.

It was reasonable for WFC not to release any of the $100,619.04 prior to the resolution of the pipe-installation-angle issue in summer 2021, based on the possibility (which was never realized) that the City of Hendersonville ultimately would require the relevant pipes to be re-installed, in which case (but only in which case) the total amount of WFC's offsetting claims would have far exceeded the amount of retainage held by WFC as to Phase 1A. But the failure to release at least the above-referenced $55,324.04 *after* summer 2021 was unreasonable.

Moving on to another topic, the Court finds that RMC's failure to protect the Section 5 trench as discussed above was typical of its work throughout the subdivision (especially Phase 1B), and that RMC routinely failed to erect safety apparatuses around its excavations as required. (Tr. 1.55:4–56:5).

**F. The Parties' Respective Performance Under the Phase 1B contract**

The majority of WFC's damages claims arise from the work in Phase 1B. The parties contest some, but not all, of the issues concerning Phase 1B. Apart from allegations that RMC was required to do certain things that RMC did not do at all, WFC's allegations can be broken into eight general categories: untimeliness; improper installation of sewer pipes; defective and

---

[25] As explained below, the amount of appropriate offsets is $45,285. This means that the amount of Phase 1A retainage that should have been released is $55,324.04 ($100,609.04 minus $45,285.00).

incomplete work on manholes, inlets, and other structures; sediment infiltration in sanitary and storm sewers; road surface and curb failure from inadequate backfilling; improper location of utility fixtures; incompletion; and miscellaneous (other).

The proof establishes, with varying degrees of clarity but in each instance by at least a preponderance of the evidence, that RMC's work suffered from each of these defects. RMC failed to perform its work in Phase 1B with the reasonable care and skill required of a contractor in its position and under the operative circumstances.

a. Untimeliness

RMC's performance of the Phase 1B contract was untimely. There was testimony from several witnesses that work on Phase 1B was impeded by rain. (Tr. 4:188:19–23; Tr. 1.55:10–23). But there is no dispute that RMC did not maintain a dedicated on-site weather log (*e.g.*, Tr. 5.66:20–21, 67:7–15) and did not submit the notices required under the Phase 1B contract to extend the contract time based on weather delays. (D-1 ¶ 10.4). Despite the lack of a weather log, WFC's land-development manager, Ray Smith, afforded RMC in December 2016 a 33-day credit for rain. (*See* D-20; D-24). The Court concludes that WFC effectively did afford RMC an extension of this length on the Phase 1B contract. Nevertheless, even with this credit, RMC was ninety days behind schedule on the fifth milestone (and 249 days on the second milestone) when the Phase 1B contract was terminated. (*Compare* D-2 at 82 *with* D-4). Without alteration, the completion dates for milestones 2–5 would have been—given a notice-to-proceed date of April 25, 2016—January 3, April 18, April 26, and June 11, 2017. Adding 33 days extends those respective dates February 5, May 21, May 29, and July 14, 2017.

WFC provided RMC with notice as early as December 2016 that it (RMC) was behind schedule and needed to take immediate, specific steps to cure and correct the untimeliness of its

performance. (*See* D-25). Throughout 2017, WFC continued to urge RMC to increase its manpower and efficiency so as to catch up to the schedule and cure its untimeliness. (*See* D-21;D-22;D-26).

RMC's witnesses at trial asserted other kinds of delays: delays in obtaining a permit to address a bat migration, delays resulting from problems in some of the plans or designs, and delays resulting from a change in engineering firms and a mistake in the control points plotted by the engineer. (Tr. 4.188:25–189:25; Tr. 5.26:13–27:1, 113:13–114:4). The Phase 1B contract required RMC to develop and perform pursuant to a schedule that would allow it to meet the milestones established by the contract. (D-2 ¶ 2.6 & p. 82). The Phase 1B contract also provided for the extension of the allotted time and corresponding milestones via change order; RMC would have been entitled to demand change orders providing extensions and compensation necessitated by delays caused by WFC, while it could request change orders providing additional time (but not additional compensation) for delays caused by outside forces. (*Id.* ¶ 10.3). The Phase 1B contract repeatedly and unambiguously recites that changes in the work or delays will not result in extensions of the contract time absent written change orders. (*See id.* ¶¶ 6.7, 7.7).

Moreover, the Phase 1B contract provided detailed criteria for extending the contract time on account of weather delays. (*Id.* ¶ 10.4). For example, RMC was entitled to an extension due to certain weather conditions, but only if it submitted an appropriately supported request. (*Id.*). Indeed, Paragraph 10.4 expressly provides that "[RMC] shall only be allowed an extension of time if permitted under this Section [sic] and then only to the extent of the number of days in which Work could not be performed." (*Id.*). RMC was required to show that the weather condition on which it was relying "specifically affected the critical path for the Work" so as to "extend [it] beyond the Contract Time." (*Id.*).

Any weather-related delay were to be memorialized by a change order. (*Id.*). But there is no evidence that the Parties ever executed a change order, or that RMC ever demanded or requested a change order, to extend the contract time on account of any circumstances, including those identified by RMC's witnesses.

Moreover, no witness attempted to quantify the delays attributable to any of the outside forces mentioned by RMC's witnesses. Without any indication whatsoever of the length of these delays, the Court would be forced to resort to speculation in order to give RMC any particular extension of contractual deadlines on account of such delays. And the Court declines to do so.

b. Defective Sewer Laterals & Mains

The evidence shows that RMC's installation of the sewer laterals in Phase 1B suffered from widespread defects and was unworkmanlike. The defective condition that was discovered in RMC's sewer laterals is common, but the commonality of a defect does not excuse the defect, and in any event the great weight of the evidence established that the frequency with which it was found in Phase 1B far exceeded the norm and resulted from defective installation by RMC.

The lots in Durham Farms were designed to be connected to a sanitary sewer. The main sewer line runs down a street, and "laterals" run from each lot to tie into that main line. The sanitary sewer is not operated by pumps or external pressure: the waste simply flows downhill by force of gravity. In order for waste to do so, each component of the sewer system, from laterals to the whole length of the main line, must be appropriately pitched. It must also be free from sags and kinks, wherein sediment might accumulate. (*E.g.*, Tr. 1.153:14–18). Laterals that display sags or kinks, or that accumulate sediment during the construction process, must be excavated and replaced or cleaned.

The evidence established that nearly every lateral in Sections 10, 11, 17, 18, 19, 20, 21 and 22, as well as many laterals in Sections 8 and 9, had to be excavated.[26] Exhibit D-7 shows a green dot, reflecting a sanitary-sewer defect, in lot after lot in these sections. (*Cf.* Tr. 1.66:17–25). Exhibit D-7 is corroborated by photographic evidence in Exhibit D-327. (*See* Tr. 2.48:3–54:10). Both Mr. Smith and Danny Miller, the White House Utility District's project manager (Tr. 4.65:3–18), confirmed that numerous sanitary laterals required excavation. (Tr. 1.66:20–25, 67:4–12; Tr. 2.40:22–42:6, 48:21–24; Tr. 4.103:6–15).

Mr. Miller described two general types of problems that prompted the need for sewer excavations: (i) deformities (sags and bows) in the line itself and (ii) accumulated debris. (Tr. 4.83:19–85:2,113:24–114:3,122:19–22). Mr. Smith likewise testified that the need to excavate pipes resulting from (depending on the particular pipe, apparently) either or both kinds of problems. (Tr. 1.156:5–20,67:4–11).

Other witnesses testified as to whether it was normal for mud and silt to have infiltrated the sanitary-sewer system. Mr. Norris, a witness called by RMC, testified that he could not recall ever having had to excavate a lateral to remove silt. (Tr. 5.76:24–25). He also remarked that if the lines were properly capped, problematic levels of sediment would not accumulate in laterals. (*Id.* at 76:2–24).

Mr. Unland testified that line-protection protocols were in place for both phases of RMC's work. (Tr. 5.108:22–109:5). The Court does not find this testimony dispositive, and not just because it is inconsistent with the fact that the evidence established that there were problematic levels of silt in the laterals in Phase 1B. First, the testimony established that there were problems

---

[26] Drakes Creek Road in Phase 1B was given its own section number (6). Some of the references to the lateral work on lots along Drakes Creek Road describe the work as pertaining to Section 6. Because the laterals tie into lots and the lots are situated in other sections, for the sake of specificity the Court refers to the sections with lots, rather than the street section. (*Cf.* Tr. 2.98:14–99:2.)

with RMC's pipe-installation practices beginning in the latter stages of Phase 1A. White House Utility District began requiring its personnel to inspect pipes laid by RMC before the pipe trenches were filled in. (Tr. 4.102:18–24). White House inspectors' notes from 2017 also reflect poor installation protocols. (*See* D-228 at 64, 66, 87). Thus, there is evidence that RMC's internal quality-control practices for sewer-pipe installation were not functioning properly. Given the corroborating evidence, including the White House punch lists, Mr. Smith's testimony and map, and the numerous Kelchner PCOs pertaining to sewer excavations (*See* D-7; D-64; D-66; D-79; D-92; D-95; D-96; D-228), it is clear that sewer laterals in Phase 1B were, in fact, excavated in large numbers. If sedimentation in the lines were the only cause for such excavations, the Court would therefore be forced to conclude that it had occurred extensively despite the testimony of RMC's witnesses that steps were taken to prevent it.

But as indicated above, the testimony also established that deformities in the line could necessitate such excavations, (Tr. 4.83:19–85:2), irrespective of any efforts by RMC to prevent sedimentation. So whether the cause for the necessary excavation was deformities in the line or was sedimentation, the cause could exist even if RMC took steps to avoid sedimentation. Ultimately, the Court concludes that one or both of these conditions together resulted in the need to excavate each of the laterals and mains noted in the evidence as having failed post-installation tests. And regardless of which factor caused which of the various test failures, RMC specifically warranted that it would install, or pay for the reinstallation of, pipe and other material that would pass required tests. (D-2 ¶ 11.1).

The Court declines to speculate that all or at least many of the lateral failures were the result of defective pipe.[27] But even accepting such speculation as true, that would not change the

---

[27] Mr. Miller testified that this was a possible cause of the defects observed in the initial lateral installations. (Tr. 4.103:23–106:10,126:15–127:13.)

relevant analysis. RMC warranted its work against defects in materials and workmanship. (D-2 ¶ 12.1) ("Contractor warrants … that materials and equipment furnished under this Contract will be of good quality and new, [and] … that the Work will be free from defects[.] … Contractor further agrees that it will repair or replace any . . . materials furnished . . . against defects in material or workmanship, at its own expense."). Via the Phase 1B contract, the Parties anticipated and assigned the risk of defective components. RMC is thus not entitled to credit of money or time due to the possibility that some of its sewer laterals failed because of defective pipe.

c.  Defective and Incomplete Work on Manholes, Inlets, and Other Structures

The evidence showed that storm sewers and sanitary sewers are constructed by linking together lengths of pipe and joining the pipes at intervals to precast structures such as junctions and manholes. Although "manhole" seemingly refers only to the hole in the street itself, the hole merely provides access to a subterranean cast concrete structure. During construction, this structure is lowered into the ground, frequently in stackable sections. (Tr. 5.53:24–54:12; D-168; D-169). In the instant case, the numerous references to "manholes" refer to these structures, not the mere hole.

In addition to manholes and similar junction boxes, the storm cellar pipes were supplemented by inlets, which are the familiar iron grates seated in curbsides that admit storm water (and various detritus and other material) to the underground system of pipes that serves to carry away surface water from streets. Inlets are connected to the pipes by masonry structures. (D-193; Tr. 2.116:25–117:5). Like manholes and junctions, an inlet is a precast concrete unit lowered onto the masonry footing. (Tr. 4.119:18–120:17). To function properly, the inlets must line up with the adjacent curbs, which are poured after the inlets are installed. The inlets can be (and normally are) given slight adjustments using a mechanism built into the inlet, but if the inlet is initially

positioned too far out of place for the internal mechanism to bring it into alignment with the curb, the only solutions are to move the curb to bring it into alignment with the inlet or to pry up the inlet and alter its masonry footing to bring it into alignment with the curb. (D-199; D-200; D-202; Tr. 2.251:10-255:8).[28]

The testimony established that the White House Utility District requires a two-part epoxy coating be applied to the inside of manholes, to protect them from erosion caused by sulfide gases emitted by sewage. (Tr. 4.119:16–120:5). The coating cannot be applied until the manhole has been installed and paved over. (Tr. 3.33:12–17; Tr. 4.127:14–128:6). But as just indicated, it is required for White House approval of the sewer system. (*See* Tr. 4:128:25–129:5; 120:6–17; D-228 at 92, 94). As Mr. Norris admitted, the Phase 1B contract required RMC to install the coatings. (*See* Tr. 5.90:13–16; *see also* D-2 ¶ 13.5). And it is undisputed that RMC did not do so.

The evidence also showed that some of the manholes installed by RMC were either improperly situated or placed without "ConSeal," (presumably a trade name for) an adhesive rubbery seal placed between the stacked sections. (*See* Tr. 1.152:25–153:8; Tr. 2.25:2–4, 29:3–13, 43:16–22). The White House Utility District protocol requires vacuum-testing the manholes to check the ConSeal's presence and effectiveness after the roadway has been paved. (*See* Tr. 2:12-14; Tr. 1.229:14–25).

Where the manholes were installed without ConSeal, or where the ConSeal failed a White House vacuum test, WFC was required to excavate the manhole, replace any damaged castings (*cf.* Tr. 2.29:14–15), and reinstall a properly sealed manhole. (*See id.* at 29:3–21). This process required digging a hole in and then patching over the paved roadway. (*Id.*).

---

[28] In support of this proposition, WFC cited not only what the Court has cited here, but also Tr. 4.186:11–187:19. This was in error, as the testimony there has nothing to do with the proposition for which it is cited. Nevertheless, the proposition is adequately supported by the record.

This problem affected manholes in both the sanitary sewer and the storm sewer. Exhibit D-79 establishes the extensive manpower deployed by Kelchner to repair storm structures, including manholes, at a cost of $44,276.37. Exhibits D-93, D-94, D-108, D-141, D-144, D-148, and D-155 show Kelchner deploying manpower and purchasing materials to repair sanitary manholes and junction structures, at a cost of $27,316.93.[29]

The absence of ConSeal or vacuum-test failure were not the only problems with manhole installation. Some were at the wrong elevation. (D-161;[30] Tr. 1.181:17–182:1). Others had unacceptable levels of mortar accumulated inside, to the point that they failed White House Utility District review for risk of obstructing flow. (D-228 at 88, 92).[31] Others had the opposite problem, namely a lack of mortar; the joints where pipes connected to the manhole were not sealed with mortar (or were sealed inadequately), again causing them to fail inspection. (*See* D-176; D-193).

The testimony of Mr. Smith and the visual evidence of manholes and manhole excavations together establish that many of the manholes installed by RMC in Phase 1B required repair or replacement.

Finally, in addition to manholes, numerous storm inlets required repositioning. There was no dispute that RMC had not made final adjustments on the inlet's castings (via the inlet's internal mechanism), as this was an end-of-job task. (Tr. 5.55:7–16). But the testimony also established that other inlets had to be moved beyond mere anticipated adjustments. While the expense of final

---

[29] Each of the Exhibits mentioned in this paragraph is a "Change Order Request" from Kelchner to WFC. This kind of request is known as a proposed change order ("PCO"). This term is synonymous with "change order request". (Tr. 4.164:5-15).

[30] D-161 contains videos of Durham Farms taken on RMC's last day on the job, October 13, 2017.

[31] D-228 comprises a collection of numerous daily field reports, including photographs, from a contractor hired by WFC to perform construction monitoring.

adjustment via the inlet's castings may have been unavoidable, the Court finds that the inlets that required substantial revision were installed in an unworkmanlike manner. (*See* D-97, D-109).

d.  Sediment Infiltration in Sanitary and Storm Sewers

The evidence showed that many parts of the sanitary and storm sewer systems had to be cleaned of accumulated sediment following RMC's termination. The parties do not dispute that the sedimentation occurred. Instead, they dispute whether RMC took appropriate measures to prevent it in the first place.

The parties' agreement imposed an express obligation to keep water out of open excavations. (D-2 ¶ 8.5). This is important because of course water is what carries the matter that can be deposited as sediment—and, more specifically deposited as sediment in the pipes if the water is not kept out of the pipes.

Construction companies installing subterranean utilities employ several techniques to minimize the entry of mud into the systems being installed.  One basic tenant is to create positive drainage away from the ongoing work, so that water runoff carries any sediment away from, rather than into, the exposed pipes and structures. (Tr. 1.57:14–19).

Because grading goes only so far in keeping water out of a hole in the ground, measures beyond mere grading are necessary. These measures comprise barriers of assorted types placed during the construction process on, around, and over the various sewer components. For example, storm inlets are fitted with a combination filtration system consisting of a "silt sack" that sits inside the inlet and a tubular "eel" that lies across the top of the inlet. (Tr. 1.219:21–220:6). In keeping out sediment, the former is more important than the latter. (Tr. 1.220:3–6). As for manholes, they have their own covers to help keep out sediment, and the waterproofing between manhole sections

also assists with the exclusion of sediment. (Tr. 2.29:3–13; D-168). Individual pipes have caps or plugs. (Tr. 5.52:1–9, 73:9–76:24).

Mr. Norris and Mr. Unland testified that RMC had protocols for protecting the sewer systems by installing fabric and employing caps and plugs. (Tr. 5.51:18–52:6, 108:1–109:3). Mr. Norris testified that he saw inlet protections in place in Phase 1B, but he also admitted that he was not on the job site every day and did not inspect all of the inlets. (Tr. 5.71:3–72:19). Mr. Smith, by contrast, testified that RMC placed eels on top of inlets but was remiss about installing the silt sacks in the inlets. (Tr. 1.220:7–22).

The videos and photographs taken immediately following RMC's termination that were admitted into evidence show extensive accumulations of mud in the visible pipes. (*See* D-161 at 02; D-213; D-214; D-215; D-216). The exhibits and testimony also showed water infiltration into manholes at that time, and the testimony indicated that such infiltration carried sediment. (*See* D-181; Tr. 2.115:16–116:4).

The Court concludes that WFC has established by a preponderance of the evidence that unacceptable levels of sediment infiltrated the sewer system during the time it was under RMC's care prior to termination of the Phase 1B contract. RMC would have been required to remedy this condition had it remained the Phase 1B contractor, as the sedimentation prevented the pipes from passing utility-district inspections. (*See* D-228 at 86, 88, 90; *see also* D-2 ¶¶ 1.9, 4.4.3 & p. 83).

e.   Erosive Damage Due to Improper Backfilling

Installing roadways and attendant infrastructure entails a rather precise schedule and sequencing of events: excavation, grading, installation, backfilling, and finishing. Improper work in the early stages of the sequence, or failure to conform to the proper schedule, can result in an unstable road surface that develops premature sags, fissures, and other defects. Roads that fail in

this way must be first removed from the top down to the extent necessary to correct the destabilized layer and then reinstalled.

Modern asphalt roads are installed in layers, in the following sequence from the bottom up: first a layer stone, then a binder layer, and finally a topcoat of asphalt. (Tr. 2.138:11–24). During the development process, the roads are generally left without the topcoat until the very end. (*Id.* at 138:25–139:12).

The stability of the road surface depends on the stability of the roadbed underneath it. If the roadbed becomes unstable and sinks or shifts, the road surface will crack and deteriorate. (D-44; Tr. 1.203:6–204:25.) This destabilization can be caused by water seeping under the road surface. (*Id.*). One notable way whereby water can access the roadbed is by running off adjacent lots and underneath curbs at the edge of those lots. This happens where the excavation from the curb installation has not been "backfilled" to create a consistent grade from the lot over the top of the curb. Proper backfilling allows water to run off the lot and into the street (and, from there, into the storm sewer) rather than into the back of the curb and, from there underneath the road. (*See* Tr. 1.205:7–25).

The Court admitted into evidence a pavement-evaluation report prepared by third-party witness Jerry Gammon, a state-licensed professional engineer. (D-254). Mr. Gammon's report described severe deterioration in October 2017 of the surface of Edenburg Drive and Misty Way, which are streets in Section 14 of Phase 1B. Mr. Gammon concluded that this deterioration resulted from "surface water infiltration behind the concrete curbs." (*Id.* at 3). He buttressed this conclusion by taking core samples that revealed "subsurface water beneath the pavement." (*Id.*).

But the road failure did not occur suddenly in October 2017. Contemporaneous correspondence from December 2016 indicated that at least on Misty Way, it had progressed notably by that point. (*See* D-44).

The Court also viewed images of Edenburg Drive and Misty Way in the video admitted as D-161 (parts 22 and 23) (*see* Tr. 1.174:14–175:6, 178:20–23, 180:14–18, 212:12–213:11). Other exhibits established that at the time of its termination, RMC had left other curbs not backfilled. (D-190; Ex. 328).

The testimony showed that the roadbeds for these streets passed initial inspection by the paver, Rogers Group, and the City of Hendersonville in the form of "proof rolls." Proof rolls involve literally rolling a heavy truck along the unpaved roadbed to see whether it deforms under the weight of the truck. (*See* Tr. 1.188:11–189:3).

The Phase 1B contract expressly obligated RMC to protect the work so as to "prevent water from running … under concrete surfaces." (D-2 ¶ 8.5). Likewise, the contract required RMC to protect, and to provide compensation for damages it caused to, other contractors' work on the job site. (*Id.* ¶ 9.1). Here, the evidence establishes that RMC failed to protect the ongoing work by properly backfilling curbs and that, as a result, water ran under the curbs and paved roadways, infiltrating the roadbed and causing the road surface to fail.

The record shows that WFC incurred substantial expense repairing Edenburg Drive and Misty Way. *See infra*. (*See* D-330;D-61).

### f.   Improper Location of Utility Fixtures

Under the Phase 1B contract, RMC was responsible for situating water valves, boxes for electrical transformers, and similar fixtures. The record establishes that RMC installed a number of these fixtures in the wrong places.

Misplaced water valves are seen in the video admitted as D-161 (part 25) (*See* Tr. 1.233:13–23). They are also visible in D-211 and D-212 (*See* Tr. 2.113:8–25; 114:1–7). There was no countervailing testimony from RMC's witnesses denying that RMC installed the valves in the wrong location or that RMC was not responsible for their installation in those locations. There was testimony that such valves were generally "adjusted at the very end," suggesting that RMC would have corrected these items itself had it completed performance under the Phase 1B contract. (*See* Tr. 5.54:23–55:2). This testimony reinforces, rather than undermines, the proposition that the misplaced valve boxes were RMC's responsibility and that their misplacement constituted a breach of the Phase 1B contract.

RMC did not install the electrical lines and transformers in Durham Farms, but RMC was responsible for installing the conduit through which the wires ran and for situating the footings onto which the transformers were placed. (*See* Tr. 1.70:4–17, 195:25–196:14). The evidence established that the footings for certain transformers were misplaced by RMC and had to be moved. (*See* Tr. 1.215:10–216:10; Tr. 2.114:12–115:1; D-212; D-161 (parts 8 and 22)). Kelchner performed these relocations, thereby occasioning expense for WFC in the process. *See infra*.

g.   Miscellaneous Items

Other defective conditions were shown via the evidence, including damaged and misaligned curbs. (Tr. 3.186:11-187:19; Tr. 5.95:12-16; D-161; D-220; D-161 (part 24)).

h.   Incompletion

The record shows that when RMC was terminated in October 2017, it had not performed some portions of the Phase 1B work at all. It is undisputed that certain work remained unperformed under the Phase 1B contract and that WFC incurred expenses completing this work in the first instance via a substitute contractor.

i. Section 16

A special note is warranted with respect to Section 16. The deductive change order that removed the balance of the work in Section 16 from the Phase 1B contract is not in evidence. However, the testimony was that the parties did not intend via such change order to extinguish claims against, or the responsibility of, RMC for inadequacies in the work that it had already performed in that section; the intention instead was merely to remove from RMC any obligation to complete further work there. (Tr. 3.162:24–163:19).

**G. Amount of Money "Left in" the Phase 1B Contract, and Amount of Work Required to be Completed under the Phase 1B contract, at the Time of Termination**

As RMC has conceded, WFC had cause under the Phase 1B contract to terminate it for cause and properly did so. (Tr. 4.19:16–23). At the time of termination, WFC was withholding $370,270 in retainage with respect to the Phase 1B contract.

As noted above, at the time of termination of the Phase 1B contract, there was $501,994.23 "left in the contract" to complete Phase 1B. In other words, of the original full contract amount, all but $501,994.23 either had been paid by WFC, been kept by WFC as retainage, or was already payable to RMC (in the amount of whatever part of the two unpaid fee applications was actually payable to RMC). So, subtracting from the original contract amount both what had already been paid and what was already required to be paid for work already completed in Phase 1B, $501,994.23 remained available to pay for the takeover work on Phase 1B. (Notably, "completion" here refers to doing the work that the Phase 1B contract required RMC to do but that had not yet been done; the term omits any "repairing" to correct problems with work that RMC already had done). Moreover, RMC contends that the work on Phase 1B actually could have been completed for the $501,994.23 that was left in the contract. If RMC is correct about this, then WFC's expenses *above* $501,994.23 to complete RMC's contracted Phase 1B work after RMC was terminated

potentially would not be awardable to WFC. Specifically, consistent with the above-discussed principles regarding mitigation of damages, expenses *above* $501,994.23 would be awardable to the extent (but only to the extent) that they reflect reasonable efforts to mitigate damages caused by RMC's failure to complete the work on Phase 1B for the contracted amount—and such reasonableness would naturally be called into question if, as RMC contends, the prospective reasonable cost of completion at the time of RMC's termination actually was the amount then left in the contract, i.e., $501,994.23.

WFC vigorously disputes RMC's contention on this point. It asserts that the amount left in the contract was inadequate for completion in part because (according to WFC), "RMC had billed for—and thus its [final] pay application reflected as complete—work that had not been performed in full." (Doc. No. 111 at 50). Mr. Foust testified that the amount remaining in the original contract was a poor estimate of the actual cost to complete the takeover work. (Tr. 3.50:24-51:4). On the other hand, because he could not say what percentage of the Phase 1B contract work remained to be completed by Kelchner as takeover work, (Tr. 3:50:3-11), he plainly was not in a good position to opine as to what the actual reasonable cost of completion was. But in a further challenge to RMC's asserted figure for the actual cost of completion, WFC accurately paraphrases relevant testimony as follows:

> [RMC's former employee (and RMC's trial witness)] Norris also admitted [at trial] that while [RMC's] budget would have had room for "some remedial items," RMC could not have excavated all of the sanity-sewer laterals in Section 6, or in Sections 8 through 11 and 17 through 20. (Tr. 5.91:24–92:5). He also admitted that the bid RMC submitted—and thus the amount left remaining in its contract after its final payment application—did not contemplate the expense of removing entire manhole structures after they had been installed and paved over. (Tr. 5.94:13–25). He admitted that RMC's bid—and thus the amount left remaining in its contract after its final payment application—did not contemplate replacing curbs that were damaged during the construction process. (*Id.* at 95:9–16). Nor did the amount remaining in RMC's Phase 1B contract include costs for replacing Misty Way and Edenburg Drive.

(*Id.*). Moreover, taken as a whole, Mr. Foust's testimony (which the Court credits on this point because it seems far from embellished and is supported by Mr. Foust's involvement in Phase 1A and professional experience) makes plain that in his view, the percentage of the work for the entire Phase 1B contract (as amended by the excising of Section 16) that remained to be completed was greater than eight percent, (Tr. 3.50:3-18), which exceeded the percentage of the entire contract amount that was still left in the contract.[32] Considering all of this testimony, the Court cannot find (and RMC does not assert) that the reasonable cost of completion was any less than the amount that was left in the contract at the time of termination of the Phase 1B contract.

When RMC fell behind on the Phase 1B contract, it and WFC entered into a change order to the Phase 1B contract that excised Section 16 from the Phase 1B contract.[33] RMC had performed a small amount of initial work in Section 16, largely related to the installation of three large sanitary-sewer structures (*see* D-7), but had otherwise not reached that portion of the work.

WFC then hired another contractor, Kelchner Inc. ("Kelchner"), to complete Section 16 under an agreement dated August 21, 2017 (P-24, "Section 16 Contract"). Kelchner was subsequently acquired by an entity known as the Wood Group (*see* Tr. 1.139:10-16; D-325B–325H (showing contractor name)), and the later documents originating from this entity bear the name "Wood" in place of "Kelchner." For ease of reference, the Court herein refers to the entity simply as "Kelchner," irrespective of the time involved.

---

[32] On cross examination Mr. Foust admitted the appropriate figure to use for the entire contract amount was approximately $8.6 million (and not the higher amount (8.9 million) that applied prior to the change order excising Section 16). (Tr. 3.95:4-14). The figure of $501.994.23 (and also, for that matter, $482,283.47) divided by $8.6 million, stated as a percentage, is slightly less than six percent.

[33] A change order serves to amend an existing construction contract, typically with respect to the work to be performed, the amount to be paid to the contractor, or both.

WFC contracted with Kelchner that same day (August 21, 2017) to perform horizontal-construction services in Phase 2 of Durham Farms. (P-23). Notably, this was all still prior to the time that WFC terminated the contracts with RMC.

## H. Selection of Kelchner to Do Phase 1B Takeover and Repair Work[34]

Although Kelchner previously had been selected by WFC to do the work referenced just above, that did not necessarily mean that Kelchner would or had to be selected as the contractor to do takeover work, repair work, or both on Phase 1B.

Take, for example, the takeover work that appeared necessary to complete the work under RMC's Phase 1B contract. WFC could have let bids out to *other* contractors to see whether they would complete the remaining line items for the amount left in RMC's contract; *i.e.,* $482,283.47, or for some other amount that was less than what WFC ultimately paid Kelchner to perform the takeover work on Phase 1B. As made clear by Thomas Foust, WFC's project manager at Durham Farms, WFC did not do so; instead, WFC made the decision to contract with Kelchner to do this work, without consideration of other contractors, because Kelchner was "already there." (Tr. 3.84:13-17). As for paying Kelchner (once Kelchner was selected), WFC did not ask Kelchner whether Kelchner would complete the work for the amount that was still left in the contract. (Tr. 3.84:18-85:4). Instead, WFC took the balance left in RMC's contract and then arbitrarily marked it up by 25 percent, (Tr. 3.147:24-148:2) which added another approximately[35] $120,570.86 to the

---

[34] The Court's findings in this section are based largely on the testimony of Thomas Foust, WFC's project manager at Durham Farms, in which capacity he handled contractual issues, including change orders and approving contractor invoices. In selected places, the Court finds it appropriate to cite to the transcript of his testimony that the Court is describing here.

[35] The figure would have been exactly $120,570.86 *if* WFC at the time was treating the amount left in the contract as $482,283.47. But it is unclear that WFC was using that particular figure at the time, (Tr. 3.149:22-150:1), and as noted above, later WFC asserted a different figure ($501,994.23). What the record reflects is that WFC at the time was using a figure of somewhere around $500,000. (Tr. 3.147:24-148:2).

amount to be paid to Kelchner for Phase 1B. (*Id.* 148:18-23). Setting aside the issue of whether at least some percentage markup was appropriate, the Court concludes based on the record as a whole that the particular markup chosen (25 percent) was chosen arbitrarily, without any particular basis therefor.

In addition to including in Kelchner's takeover work contract, a figure of 125 percent of whatever amount WFC was then deeming to be the amount left in the contract, WFC included an additional amount to reach Kelchner's original figure for the takeover/completion work, i.e., $739,690.87. This amount—which is calculable as $136,836.54 *if* the figure for the amount left in the contract was treated as $482,283.47, and in any event would have been close to that figure— was for coating manholes with the epoxy substance. Mr. Foust testified to the effect that the epoxy manhole coating was fairly characterized as takeover work—i.e., work within the scope of RMC's Phase 1B contract rather than additional work not contemplated by that contract—but the Court finds otherwise; Foust's explanation for this characterization was weak,[36] and if the additional work actually was takeover work, then there would have been no need to do a change order (with an additional corresponding cost) for it, as the work and cost already would have been factored in to the contract. The result is the addition of this approximately $136,836.54 is not attributable to RMC's nonfeasance or malfeasance under the Phase 1B contract, and thus it cannot be considered an expenditure necessary to mitigate damages from RMC's nonfeasance or misfeasance as to its obligations under the Phase 1B contract.

Having terminated RMC from Phases 1A and 1B and decided that Kelchner would do the takeover work (for Phase 1A and Phase 1B), WFC faced the natural question of how to handle

In any event, the markup of 25 percent would have meant a markup of between just above $120,000 and just above $125,000.

[36] The Court perceives that that weakness was on full display in the Court's colloquy with Mr. Foust on this topic. (Tr. 3.32:5-36.18).

Kelchner's additional work from a contractual perspective. As it turned out, WFC executed a change order to the Section 16 Contract with Kelchner to cover then-anticipated work for completing the rest of Phases 1A and 1B. (D-57). The initial change order consisted primarily of line items from the Phase 1B contract's Schedule C for which RMC had not yet billed or not yet billed in full. (Tr. 3.22:17-23:5). Mr. Foust, WFC's project manager, however, executed additional change orders that added additional work that had not been performed, such as the epoxy coating of the inside of the manholes. (*Id*.; Tr. 3.24:8-22). Consistent with Foust's above-referenced view that the epoxy coating in particular was within the scope of the Phase 1B contract, WFC maintains the view that the additional takeover work as a whole was within the scope of the Phase 1B contract, such that the added cost of such additional takeover work should be considered an expenditure necessary to mitigate damages from RMC's nonfeasance or misfeasance as to its obligations under the Phase 1B contract. The Court disagrees because it simply fails to see how work can be considered to have been within the scope of the Phase 1B contract and yet not covered by the Phase 1B contract such that an additional change order (and attendant additional cost) were required.[37]

So as Kelchner's work progressed, further amendments were made to the Section 16 contract via change orders to account for additional work in various parts of Phase 1B (rather than just in Section 16), either at WFC's direction or because WFC found on site what it contended was some additional incomplete work (that needed to be taken over by another contractor for completion) or defective work (that needed to be repaired by some other contractor). (*See* D-58–

---

[37] So-called "repair work" is another matter entirely; to the extent that work was required to repair/fix/mitigate work that was within the scope of the Phase 1B and was done by RMC, but done is such a way that costs were reasonably incurred to make the work conform to contractual standards for the work, such work may constitute appropriate mitigation of damages flowing from RMC's breach of the Phase 1B contract.

D-68). D-8 shows the line items associated with the various change orders and classifies those as being for either "takeover" work (also known as "completion" work) or "repair work." Kelchner's project manager, Allen Keiser, testified about (among other things) the change orders. Based on his testimony, the Court finds that approximately 182 relevant proposed Change Orders ("PCOs," also known as "change order requests") evolved into 12 relevant signed Change Orders;[38] even though the PCOs were drafted by Kelchner, only 10 percent of those were at Kelchner's request, with 90 percent of them coming from WFC as a manifestation of what Keiser characterized as "a shopping list." (Tr. 4.165:11-168:22).

Of the 12 relevant Change Orders, five (Nos. 2, 5, 7, 10 and 13) were classified by WFC as being for repair work, while seven were classified by WFC as being for takeover work (Nos. 1, 4, 6, 9, 12, 15 and 17).

Unlike the original Phase 1B contract, the takeover contract-by-way-of-Section 16-change-orders entered into between WFC and Kelchner was a "time and materials" contract. WFC agreed to pay Kelchner what it took, in terms of worker-hours and material, to complete the work that WFC asked Kelchner to do, up to a maximum specified in the schedule of values. (D-330; D-57).

As established by the testimony of Mr. Keiser, Kelchner performed the work reflected on the pay applications and PCOs that were introduced.

RMC suggested during trial that Kelchner did not begin work on Phase 1B until April 2018 and that the project lay fallow and unprotected between October 2017 and April 2018. The

---

[38] There were additional change orders, for which WFC does not seek damages, that are reflected in the record as "Freehold Requested Changes," items the Court understands to have been additional or different work neither necessary to correct a defect left behind by RMC nor strictly within the remaining scope of RMC's original Phase 1B contract. (*See, e.g.*, D-240).

evidence does not support this contention; rather, the record shows that Kelchner commenced work on Phase 1B promptly in October 2017. (*See* D-72).

**I. WFC's Payment to Kelchner and so-called "third party contractors" to complete and/or correct RMC's contracted work on Phase 1B**

It is undisputed that WFC actually paid to Kelchner and so-called "third party" (the terms used in D-332) the amounts that WFC is seeking to recover.

<u>CONCLUSIONS OF LAW</u>

**A. <u>RMC's Claims</u>**

As indicated above, RMC claims the following in connection with Phase 1A: (1) the amount of two never-paid Fee Applications executed under oath on August 31, 2017 and on September 29, 2017, respectively, totaling $727,881.01; and (2) $100,609.04 in withheld retainage.[39] As mentioned above and discussed below, WFC claims certain offsets against these amounts (most relevantly, offsets against the withheld retainage in particular). RMC also claims various items—which RMC asserts it is entitled to recover under Tennessee's Prompt Pay Act— collateral to its claim that WFC's failure to pay the two Fee Applications and to pay over the retainage was wrongful.

With the above facts (and, in some places, determinations of various sorts) in mind, the Court addresses each of RMC's claims in turn.

1. <u>RMC's claim for a fine of $3,000 per day under Tennessee's Prompt Pay Act fails because the fine is a criminal sanction available only in criminal cases, not in civil cases.</u>

---

[39] This amount represents the net of $353,124.96, which WFC originally (and properly, as far as the record reflects) withheld as retainage, and amounts that WFC ultimately released to RMC from retainage. As discussed below, RMC is now content actually to concede that a good chunk of the $100,609.04 can be retained by WFC to offset certain of WFC's claimed damages.

Tennessee's Prompt Pay Act, Tenn. Code Ann. §66-34-101 et seq., provides in pertinent part as follows:

> The owner, whether public or private, shall release and pay all retainages for work completed pursuant to the terms of any contract to the prime contractor within 90 days after completion of the work or within 90 days after substantial completion of the project for work completed, whichever occurs first.

Tenn. Code Ann. §66-34-103(b). RMC alleges that WFC has violated this provision by not paying the $100,609.04 retainage WFC has withheld with respect to Phase 1A, and by not paying the $370,270 it has withheld as to Phase 1B. Additionally, RMC asserts that as a result of such violation(s), WFC is liable for a fine prescribed elsewhere in the Prompt Pay Act, namely subsection (e) of the same statute:

> (1) It is an offense for a person, firm, or corporation to fail to comply with subsection (a) or (b) or § 66-34-104(a).
>
> 2(A) A violation of this subsection (e) is a Class A misdemeanor, subject to a fine only of three thousand dollars ($3,000).
>
> (B) Each day a person, firm, or corporation fails to comply with subsection (a) or (b) or § 66-34-104(a) is a separate violation of this subsection (e).
>
> (C) Until the violation of this subsection (e) is remediated by compliance, the punishment for each violation is consecutive to all other violations.

Tennessee Code Ann. § 66-34-103(e).

RMC asserts that the fine prescribed here is applicable in this case. Based on that assertion, RMC claims that this Court should impose on WFC a fine of $3,000 per day for every day from November 17, 2017 to the present (and thereafter, until the retainage is released). This claim is a non-starter. Subsection (e) prescribes a fine only in *criminal* cases; it can be imposed only as a criminal sanction, not as a sanction in a civil case, and still less as a sanction payable to the aggrieved contractor. The Tennessee Court of Appeals helpfully explained this at length in *Beacon4, LLC v. I & L Invs., LLC*, 514 S.W.3d 153, 210 (Tenn. Ct. App. 2016), *overruled on other*

*grounds by In re Mattie L.*, 618 S.W.3d 335 (Tenn. 2021).[40] This is an explanation that this Court

need not rehash to support the rather obvious conclusion that "the $3,000–per-day fine provided

for in Tennessee Code Annotated § 66–34–103(e) is not a remedy available in a civil action under

the [Prompt Pay Act]." *Id.* Suffice it to say that—as should have been apparent to RMC and, for

that matter, WFC which surprisingly did not raise the point—[41]the provision for a $3,000 per-day

fine is strictly a criminal sanction. The provision is found only under a statutory subsection (Tenn.

Code Ann. § 66-34-103(e)) that makes certain violations of the Prompt Pay Act a Class A

misdemeanor; by contrast, civil remedies are prescribed elsewhere, namely in Tenn. Code Ann. §

66-34-602 *et seq.* Accordingly, RMC's request for imposition of such a fine is way off base and

must be denied.

> 2. RMC's claim for attorney's fees under Tennessee's Prompt Pay Act fails because RMC has not established as required that WFC acted in bad faith.

RMC seeks a second form of relief as well. "[R]easonable attorney's fees may be awarded

against the nonprevailing party if the nonprevailing party acted in bad faith." Tenn. Code Ann. §

---

[40] The Sixth Circuit has noted:

> In diversity cases such as this, we apply state law in accordance with the controlling decisions of the state supreme court. If the state supreme court has not yet addressed the issue presented, we must predict how the court would rule by looking to all the available data. *See id.* "Relevant data include decisions of the state appellate courts, and those decisions should not be disregarded unless we are presented with persuasive data that the [state] Supreme Court would decide otherwise." *Kingsley Assoc. v. Moll PlastiCrafters, Inc.,* 65 F.3d 498, 507 (6th Cir.1995).

*Allstate Ins. Co. v. Thrifty Rent-A-Car Sys., Inc.*, 249 F.3d 450, 454 (6th Cir. 2001) (citation omitted). Herein, when the Court cites a decision of the Tennessee Supreme Court or Tennessee Court of Appeals, it does so with confidence that the Tennessee Supreme Court today would not decide differently with respect to the cited proposition(s).

[41] Counsel's non-recognition of the issue here is an exception to what the Court has observed throughout the trial and post-trial process, namely, considerable professionalism on the part of both counsel. ?WFC's counsel)?. In the Court's view, counsel are to be commended for their apparent cordiality towards one another, for rarely resorting to hyperbole in advocating for their respective clients.

66-34-602(d). RMC (unsurprisingly) implies that it should be the "prevailing party" with respect to its dispute with WFC over retainage. But it fails to assert, let alone establish, that WFC (the purported nonprevailing party) acted "in bad faith" within the meaning of the statute. Indeed, RMC does not even mention the requirement of "bad faith"; still less does it describe the standard for assessing "bad faith" in this context. Thus, the unsupported claim for attorney's fees is denied.

3. RMC's claim for prejudgment interest under Tennessee's Prompt Pay Act is valid.

RMC requests one more form of relief, namely prejudgment interest.

The Prompt Pay Act additionally provides:

> Any payment not made in accordance with this chapter accrues interest, from the date due until the date paid, at the rate of interest for delinquent payments provided in written contract or, if no interest rate is specified in a written contract, then one and one-half percent (1.5%) per month.

Tenn. Code Ann. § 66-34-101. If WFC did not make a payment in accordance with "this chapter," i.e., the Prompt Pay Act, then it is liable for interest as specified in this provision.

WFC contends that it was proper for it to withhold all of the retainage it withheld because so doing was justified essentially as a proper offset against amounts allegedly owed WFC due to WFC's (purportedly valid) claims against RMC for its (RMC's) misfeasance and nonfeasance amounting to breach of contract. The Court has found above that RMC breached the Phase 1A contract, but that does not mean that it was appropriate for WFC to withhold all of the retainage held with respect to Phase 1A. Consistent with the discussion above, the Court finds that even with appropriate offsets to the retainage on Phase 1A, a net amount of retainage (in the amount of $55,324.04) was due to be paid RMC with respect to Phase 1A beginning September 23, 2021. Given this finding, WFC's contention requires the Court to accept that WFC's withholding of Phase 1A retainage was "in accordance" with the Prompt Pay Act because (as WFC asserts and

RMC disputes) it was reasonable for WFC to withhold this amount as an offset against amounts allegedly owed WFC due to what WFC contends is RMC's breach of contract on *Phase 1B*.

WFC does little to attempt to persuade the Court to accept this proposition. The closest it comes to doing so is when it cites *Twin K Constr., Inc. v. UMA, Geotech., Constr. Inc.*, No. 3:21-cv-74, 2022 WL 880002, at *7 (E.D. Tenn. March 23, 2022). There certainly is nothing wrong with citing a district court case as persuasive authority, especially where (as here) it is not represented to be binding. But this unpublished Eastern District of Tennessee case is, of course, very far from precedential. In any event, the Court does not even need to decide whether to accept the proposition purportedly conveyed by this non-binding case. That is because, quite simply, the case does not actually stand for that proposition. On the cited page, the closest thing to the offered proposition is the court's statement that the Prompt Pay Act permits "a general contractor to reasonably withhold retainage pursuant to the terms of the parties' contract, as long as such retainage does not exceed 5% and is kept in escrow until the dispute is resolved."[42] *Twin K Constr., Inc.*, 2022 WL 880002, at *7 (E.D. Tenn. Mar. 23, 2022) (citing Tenn. Code Ann. §§ 66-34-104 and 303). Consistent with *Twin K Constr., Inc.*'s statement of what the Prompt Pay Act permits, the Prompt Pay Act provides:

> This chapter does not prevent the prime contractor from reasonably withholding payment or a portion of payment to the remote contractor, as long as the withheld payment is in accordance with the written contract between the prime contractor and the remote contractor. The prime contractor may also withhold a reasonable amount of retainage as specified in the written contract between the prime contractor and remote contractor . . . .

Tenn. Code Ann. § 66-34-303.

---

[42] It is clear that *Twin K Constr., Inc.* used the term "general contractor" as a synonym for "prime contractor," the term used in the Prompt Pay Act itself. Notably, the Prompt Pay Act in some respects seems to treat (albeit in different Parts of the Prompt Pay Act) the owner/prime contractor relationship the same as or similar to the way it treats the prime contractor/sub-contractor relationship, and vice versa.

But it's one thing to say (as did the Court in *Twin K Constr., Inc.*) that a "general contractor [can] reasonably withhold retainage pursuant to the terms of the parties' contract." 2022 WL 880002, at *7 (E.D. Tenn. Mar. 23, 2022). And it is quite another thing to say (as does WFC here) that "[w]here a contractor fails to complete the work under a contract or an owner has a good-faith claim to withhold payment [retainage][43] for the contractor's breach, the Prompt Pay Act does not create a right to payment that does not exist under the contract itself," (Doc. No. 111 at 70)—by which WFC clearly means that "[w]here a contractor fails to complete the work under a contract or an owner has a good-faith claim to withhold retainage for the contractor's breach, the Prompt Pay Act [allows the general contractor to withhold payment.]" Under WFC's asserted proposition, where the general contractor has a good-faith basis to withhold payment, the general contractor can reasonably withhold payment. But *Twin K Constr., Inc.* (1) does not say this expressly, and (2) is properly deemed to imply this only if "having a good-faith claim to withhold payment" (WFC's words) is equivalent to "reasonably withhold[ing] retainage [i.e., payment]" (*Twin K Constr., Inc.*'s words) ; the two may be but are not necessarily equivalent, and Defendant does not explain why they are. *See* 2022 WL 880002, at *7 (E.D. Tenn. Mar. 23, 2022).

Defendant's paraphrasing of *Twin K Constr., Inc.*, be it right or wrong, is beside the point anyway. It does not support the proposition that a general contractor can withhold retainage on one contract in order to secure funds from the subcontractor to apply to help pay (i.e., to offset) the general contractor's claims for breach of a *different* contract. RMC directly asserts that this proposition is false. (Doc. No, 110 at 9). RMC does not support its assertion, but the statute itself does; it states, as noted above, that the Prompt Pay Act does not prevent the prime contractor from

---

[43] As indicated, this section of the Prompt Pay Act has a sentence regarding "payment" and a sentence regarding "retainage". Here, WFC referred to "payment," but "retainage" actually is the more apt word here given the particular context for WFC's reference.

reasonably withholding retainage or a portion of retainage to the prime contractor, as long as the withholding is in accordance with "the" written contract between the owner and the prime contractor. The Court simply cannot construe this provision to mean that some or all of the retainage withheld by the prime contractor on one contract—"the" written contract being assessed to see whether the prime contractor could withhold payment under that contract pursuant to Tenn. Code Ann. § 66-34-303—can be withheld in accordance with *another* contract (meaning, typically, in accordance with the remedies provided in that other contract for breach of the that other contract). And absent WFC pointing to authority to support such a construction, the Court will not embrace such a construction. Therefore, the Court finds WFC's withholding of $55,324.04 of retainage—the net of the remaining retainage on Phase 1A and WFC's awardable damages with respect to Phase 1A—to have constituted both a breach of contract and a failure to pay that was violative of the Prompt Pay Act.

The $55,324.04 constitutes RMC's damages for breach of contract, i.e., the net amount that WFC should have paid RMC under the Phase 1A contract but did not. As for a remedy for WFC's non-payment in violation of the Prompt Pay Act, RMC is entitled to only one other remedy, namely interest as prescribed above. This means interest on the non-paid amount "from the date due until the date paid, at the rate of interest for delinquent payments provided in written contract or, if no interest rate is specified in a written contract, then one and one-half percent (1.5%) per month." Tenn. Code Ann. § 66-34-101. RMC does not assert a contractual interest rate, and so the default rate of 1.5 percent a month is applicable.

Although the Court already has concluded that the applicable amount here is $55,324.04, it is worth noting that RMC reaches the same figure, albeit in a different way. RMC does not assert that it is entitled to the entire $100,609.04 of withheld retainage. Instead, RMC is content to

acknowledge the propriety of a $45,285[44] deduction for net costs incurred by WFC in completing

Phase 1A; based solely on a document prepared by Defendant (D-8) as purportedly reflecting

WFC's damages as to Phase 1A,[45] RMC calculates this as $140,865—WFC's alleged cost to

complete RMC's incomplete work on Phase 1A—minus the $95,580 of that $140,865 that had

been set aside for the above-reference pipe-reinstallation work that never had to be done inasmuch

as the City of Hendersonville never required it. With that $45,285 deduction, the amount unpaid

by WFC is reduced to $55,324.04. The Court finds these calculations reasonable and supported by

the evidence. And they also reflect just a slightly different way of reaching the crucial figure of

$45,285 that is to be deducted from $100,609.04 to arrive at the figure of $55,324.04 of Phase 1A

retainage that was wrongfully withheld by WFC.

---

[44] In WFC's Proposal, WFC—based on the double-counting of $21,834.30 discussed herein—claims somewhat higher costs for "completing and correcting RMC's work in Phase 1A." (Doc. No. 111 at 34). According to WFC, "[t]hese costs can be easily listed" as follows:

| | |
|---|---|
| to RT Goodwin to install the Phase 1A "swale" culvert: | $33,405.00 |
| to Kelchner for its work on "swale" culvert installation | $21,834.30 |
| to Kelchner to clean mud out of pipes adjoining swale | $3,895.00 |
| to Kelchner to install risers on Phase 1A storm structures | $1,640.00 |
| to Kelchner to repair roadway from trench failure | $6,345.00 |
| | Total: $67,119.30 |

(Doc. No. 111 at 34). For all but one of these subtotals, WFC cites primarily to Exhibit D-8; as to the second of these subtotals, WFC cites (only) to Exhibit D-80. The Court above has dealt with WFC's claims for each of these five items, accepting the claims for all but the $21,834.30, which the Court found should not be awarded because (as far as the record shows) it was already encompassed within the $33,405.00. As for the four amounts awarded, they total $45,285.00, which is the precise amount that RMC is content to allow as a deduction on its claim for retainage as to Phase 1A.

Notably, these figures (from WFC's Proposal) for damages with respect to Phase 1A do not at all match what WFC represented in D-332 (and its opening statement) it would be claiming.

[45] This document was also entered at trial as P-28 and the last page of P-3.

Regarding the date that the interest began to run on amounts owed to it, RMC asserts that it is September 29, 2017, the date of the second of the still-unpaid fee applications. (Doc. No. 110 at 4 n.3). The Court does not see where RMC explains the basis for that assertion. The Court gathers that the idea is that only at that juncture did it become clear what final net amount was owed to RMC such that WFC was obligated to pay it (in part via release of retained funds). But if this is the idea, it is flawed because the second unpaid fee application related solely to Phase 1B (which, by RMC's own reckoning, should not be considered in determining what Phase 1A retainage should be released), and as discussed below the Court finds that WFC acted reasonably in withholding retainage with respect to Phase 1B. The idea is also flawed because the net amount owed on Phase 1B was not ascertainable for several years after September 2017, during which time (as discussed above) it remained unclear whether pipe would have to be reinstalled at a different angle at an estimated cost of more than $95,000. Per the Court's discussion above, it was only once the answer to this question became clear—that no such reinstallation and expenditure would be required—that the net amount owed RMC (to be released from retainage) became clear.

As to when this became clear, the record reflects that both parties agree that it was in the summer of 2021. This is obviously an inexact timeframe, and the parties do not even try to peg it more precisely. At the latest, this would have been on September 22, 2021, which the Court judicially notices as the date on which summer ended in 2021. Since RMC bears the burden of proof with respect to its own claims, RMC must bear the consequence of its inability to peg this date with any more exactitude. That is to say, because RMC has not proven that the date was any earlier than September 22, 2021, the Court will calculate prejudgment interest, at a rate of 1.5 percent per month, beginning September 23, 2021 and ending (approximately) 53 months later on the date of entry of these findings of fact and conclusions of law. If $55,324.04 is multiplied by

.015 and then by 53, the product is $43,567.68. This amount will be awarded to RMC as interest under the Prompt Pay Act.

    4.  <u>RMC's claim based on an alleged violation of the escrow provisions of the Prompt Pay Act appears to have been abandoned and in any event fails for lack of evidence</u>

RMC raised in its pleadings and in the Joint Proposed Pretrial Order the prospect that WFC may have failed to comply with the Prompt Pay Act's requirements that retainage be held in escrow. *Cf.* Tenn. Code Ann. § 66-34-104(a).

The Court has before it, however, no evidence of a failure to deposit and maintain the retainage under either contract in a separate escrow account. And RMC's Proposal does not address this is issue at all. RMC has thus failed to carry its burden of proof on any such claim (which RMC actually appears to have abandoned anyway) and is entitled to no relief for any claimed violation of the escrow provisions of the Prompt Pay Act.

    5.  <u>RMC will be Awarded the Amount of The Two Unpaid Fee Applications</u>

WFC does not dispute that the amounts claimed by RMC in its two unpaid Fee Applications are awardable.[46] (D-332; Tr. 1.17:3-6, 17:25-18:3). Using WFC's figures (which, as noted above, are higher than RMC's figures because they appropriately incorporate no deductions for amounts that would have been withheld as retainage), RMC is thus entitled to $536,668.23 on Fee Application No. 16, and $229,522.30 on Fee Application No. 17.

    6.  <u>In summary, RMC will be awarded $865,082.25 on its claims</u>.

For the reasons set forth above, RMC is awarded the sum of $55,324.04 (on its claim for breach of contract), $43,567.68 (on its claim for violation of the Prompt Pay Act), $536,668.23

---

[46] Naturally, WFC views these amounts only as an offset against a potential much larger award to which WFC asserts it is entitled.

(on Fee Application No. 16), and $229,522.30 (on Fee Application No. 17). The total award to RMC on its claims, therefore, is $865,082.25.

## B. **WFC's Claims**

As indicated above, WFC seeks recovery of various things, which can be divided into two categories, namely, (i) damages in the form of expenditures made to mitigate RMC's breaches of the requirement to complete, and complete in a workmanlike manner, all work required of RMC pursuant to the Phase 1B contract; and (ii) consequential and liquidated damages from delays constituting or stemming from RMC's breaches of the Phase 1B contract. Each of these categories in turn can be (and has been, by WFC) divided into sub-categories.

Finding it most efficient to address WFC's claims by category of items sought to be recovered by WFC rather than by category of breaching conduct by RMC (i.e., category of inadequate or non-performance under the Phase 1B contract), the Court addresses below in turn each of the categories and subcategories of things WFC seeks to recover.

First, however, the Court recites the principles it will apply in deciding the extent to which to award WFC damages for RMC's breaches.

The party seeking damages (typically the plaintiff but here the counter-plaintiff) bears the burden of proof as to those damages. *Waggoner Motors, Inc. v. Waverly Church of Christ*, 159 S.W.3d 42, 57 (Tenn. Ct. App. 2004); *Inman v. Union Planters Nat'l Bank*, 634 S.W.2d 270, 272 (Tenn. Ct. App. 1982). "The *existence* of damages cannot be uncertain, speculative, or remote." *Rye v. Women's Care Ctr. of Memphis, MPLLC*, 477 S.W.3d 235, 266–67 (Tenn. 2015) (quoting *Discover Bank v. Morgan,* 363 S.W.3d 479, 496 (Tenn. 2012)). "Damages may never be based on mere conjecture or speculation." *Id.* at 267 (quoting *Overstreet v. Shoney's Inc.,* 4 S.W.3d 694, 703 (Tenn. Ct. App. 1999)). "Uncertain, contingent, or speculative damages are unrecoverable."

*Jones v. Reda Homebuilders, Inc.*, No. M202000597COAR3CV, 2021 WL 2375883, at *2 (Tenn. Ct. App. June 10, 2021) (citing *Western Sizzlin, Inc. v. Harris*, 741 S.W.2d 334, 336 (Tenn. Ct. App. 1987)).

In context, it is clear here that the "damages" referred to here are an item of alleged damages allegedly caused by a breach by the defendant. That is, that item of damages cannot be awarded if is mere conjecture of speculation that alleged damages were caused by the defendant's breach.

On the other hand, "[c]ourts will allow damages for breach of contract even where it is impossible to prove the exact amount of damages." *Moore Constr. Co. v. Clarksville Dep't of Elec.*, 707 S.W.2d 1, 15 (Tenn. Ct. App. 1985) (citing *Provident Life and Accident Ins. Co. v. Globe Indem. Co.*, 3 S.W.2d 1057, 1058 (Tenn. 1928)). "All that is required [regarding the amount of damages] is proof with a reasonable degree of certainty." *Id.* (citing *Buice* v. *Scruggs Equip. Co.*, 267 S.W.2d 119, 125-26 (1952)). As *Moore* made clear, and as the Sixth Circuit has recognized, the requirement here is that the *amount* of damages, and not merely the *existence* of damages, be reasonably certain. *ECIMOS, LLC v. Carrier Corp.*, 971 F.3d 616, 641 (6th Cir. 2020) (Although "damages become too speculative only when the existence of damages is uncertain," not when the precise amount is uncertain, the evidence in support of an award must still "prove the amount of damages with reasonable certainty.") (quoting *Waggoner Motors, Inc.,* 159 S.W.3d at 57). For its part, the Tennessee Court of Appeals has stated that "[i]n general, the *existence* of damages cannot be uncertain, speculative, or remote, but the *amount* of damages may be uncertain if the plaintiff lays a sufficient foundation to allow the trier of fact to make a fair and reasonable assessment of damages." *Tennison Bros., Inc. v. Thomas*, 556 S.W.3d 697, 724 (Tenn. Ct. App.

2017).[47] So, to recover an item of damages, the plaintiff must both introduce evidence suitable for a reasonable assessment of those damages and ultimately prove the amount of those damages with reasonable certainly.

The Tennessee Court of Appeals has stated:

> In the context of a construction project based upon contract documents such as the ones involved in this case, we find that it is reasonably foreseeable that a contractor whose ability to complete its work is impaired by the owner and whose performance is thereby substantially delayed will suffer direct damages and that the extent of these damages will depend upon the unique facts of each case. These damages can include, among other things, increased payroll and other labor costs, increased material costs, costs resulting from the loss of efficiency of the use of equipment, increased costs for extended bonding and insurance coverage, and other increased overhead items that can reasonably be attributed to the performance of the work that was delayed.

*Moore Constr. Co.*, 707 S.W.2d at 15. The overarching point (though not the list of the particular kinds of foreseeable damages) from the quoted language. is applicable, albeit in reverse, in the instant case. That is, an *owner* can incur damages from a *contractor's* delay in the completion of a construction project, and the extent of such damages will vary with the facts of each case.

---

[47] When citing to state case law, the Court keeps in mind the so-called *Erie* doctrine, so named because it was announced in *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938). "Under the *Erie* doctrine, a federal court sitting in diversity applies 'the substantive law of the forum state and federal procedural law.' " *Bonasera v. New River Elec. Corp.*, 518 F. Supp. 3d 1136, 1151 (S.D. Ohio 2021) (quoting *Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 374 (6th Cir. 2009)).

The Sixth Circuit has explained:

> In diversity cases such as this, [the *Erie* doctrine requires that] we apply state law in accordance with the controlling decisions of the state supreme court. If the state supreme court has not yet addressed the issue presented, we must predict how the court would rule by looking to all the available data. "Relevant data include decisions of the state appellate courts, and those decisions should not be disregarded unless we are presented with persuasive data that the [state] Supreme Court would decide otherwise."

*Allstate Ins. Co. v. Thrifty Rent-A-Car Sys., Inc.*, 249 F.3d 450, 454 (6th Cir. 2001) (citations and footnote omitted) (quoting *Kingsley Assoc. v. Moll PlastiCrafters, Inc.*, 65 F.3d 498, 507 (6th Cir.1995)). Herein, when the Court cites a decision of the Tennessee Court of Appeals, it does so with confidence that the State Supreme Court today would not decide differently with respect to the cited proposition(s).

The Court notes that the validity of a claim by WFC for particular damages turns in large part on the application of Tennessee law of mitigation of damages from a breach of contract; this is because each of these categories of damages represents costs incurred by WFC allegedly in mitigation of its damages from RMC's breach of the Phase 1B contract.

The principles of mitigation of damages under Tennessee law were set forth within the last few years by the Tennessee Court of Appeals in a cogent discussion that quoted multiple prior decisions, one of which itself quoted a prior opinion:[48]

> "[T]he failure to mitigate damages is an affirmative defense, and the burden of proving a failure to mitigate falls on the defendant." *B.W. Byrd Metal Fabricators, Inc.* [v. Alcoa, Inc., No. E2018-01750-COA-R3-CV], 2019 WL 3889798, at *6 (Tenn. Ct. App. Aug. 19, 2019). In *Memphis Light, Gas & Water Division v. Starkey*, this Court examined the doctrine of mitigation of damages, which dictates that:
>
> > [O]ne who is injured by the wrongful or negligent act of another, whether by tort or breach of contract, is bound to exercise reasonable care and diligence to avoid loss or to minimize or lessen the resulting damage, and to the extent that damages are the result of his active and unreasonable enhancement thereof, or due to his failure to exercise such care and diligence, he cannot recover.

---

[48] As the Sixth Circuit has explained:

> In diversity cases such as this, we apply state law in accordance with the controlling decisions of the state supreme court. If the state supreme court has not yet addressed the issue presented, we must predict how the court would rule by looking to all the available data. *See id.* "Relevant data include decisions of the state appellate courts, and those decisions should not be disregarded unless we are presented with persuasive data that the [state] Supreme Court would decide otherwise." *Kingsley Assoc. v. Moll PlastiCrafters, Inc.,* 65 F.3d 498, 507 (6th Cir.1995).

*Allstate Ins. Co. v. Thrifty Rent-A-Car Sys., Inc.*, 249 F.3d 450, 454 (6th Cir. 2001) (citation omitted). Herein, when the Court cites a decision of the Tennessee Court of Appeals, it does so with confidence that the State Supreme Court today would not decide differently with respect to the cited proposition(s).

> *Cook & Nichols, Inc. v. Peat, Marwick, Mitchell & Co.*, 480 S.W.2d 542, 545 (Tenn. Ct. App. 1971). Thus, a party injured by the wrongful act of another is under a legal duty to use reasonable efforts to minimize the loss and, to the extent that the injured party fails to do so, he or she cannot recover. *Id.; see also Kline v. Benefiel*, No. W1999-00918-COA-R3-CV, 2001 WL 25750, at *7 (Tenn. Ct. App. Jan. 9, 2001). The injured party is not, however, required to mitigate damages where the duty would impose an undue burden or be impossible under the circumstances. *See Kline*, 2001 WL 25750, at *7 (citing *Cummins v. Brodie*, 667 S.W.2d 759, 766 (Tenn. Ct. App. 1983)).

244 S.W.3d 344, 353 (Tenn. Ct. App. 2007). In *Forrest Const.* [sic] *Co., LLC v. Laughlin*, this Court observed:

> The critical factor in determining fulfillment of a plaintiff's duty to mitigate is whether the method which he employed to avoid consequential injury was reasonable under the circumstances existing at the time. The rule with respect to the mitigation of damages may not be invoked by a contract breaker "as a basis for hypercritical examination of the conduct of the injured party, or merely for the purpose of showing that the injured person might have taken steps which seemed wiser or would have been more advantageous to the defaulter." As stated in McCormack, Damages, Sec. 35 (1935), "a wide latitude of discretion must be allowed to the person who by another's wrong has been forced into a predicament where he is faced with a probability of injury or loss. Only the conduct of a reasonable man is required of him."

337 S.W.3d 211, 230 (Tenn. Ct. App. 2009) (quoting *Salley v. Pickney Co.*, 852 S.W.2d 240 (Tenn. Ct. App. 1992)).

*Tennessee Bank & Tr. v. Boruff*, No. M202100552COAR3CV, 2022 WL 781048, at *7 (Tenn. Ct. App. Mar. 15, 2022).

Unfortunately, it is often very debatable what constitutes "the conduct of a reasonable man." Of course, the "reasonable man [person]" standard is an *objective* standard, but the question of how to apply that objective standard in a particular case is most certainly a subjective one; people of all stripes often can and do disagree among each other about what is and is not "reasonable" under the particular circumstances at issue. All that the undersigned can do is call it

like he sees it, perceiving as best he knows how what a "reasonable" person would have done (and not done or not feel compelled to do) under the circumstances here at issue.

1. <u>WFC will be awarded some but not all claimed expenses of takeover and repair work allegedly occasioned by RMC's breaches of its obligation to complete the work on the Phase 1B contract.</u>

As noted above, WFC contends that to complete and/or repair work in Phase 1B that RMC was obligated to complete in a workmanlike manner, WFC spent $3,992,878.48, which it breaks down as follows:

- Kelchner completion/takeover work as initially priced $ 739,690.87
- Expanded completion/takeover work $ 1,501,843.60
- Repair work paid to Kelchner $ 1,540,916.98
- Repair work paid to a third party other than Kelchner $ 210,427.03

Consistent with its remarks just above, the Court finds it most efficient to address WFC's claims by category of alleged damages rather than by category of breaching conduct. So the Court addresses below in turn each of these four categories of alleged damages. Before doing so, however, the Court notes that the validity of a claim for particular damages turns in large part on the application of Tennessee law of mitigation of damages from a breach of contract; this is because each of these categories of damages represents costs incurred by WFC allegedly in mitigation of its damages from RMC's breach.

           i.     WFC will be awarded some but not all claimed expenses for Kelchner's takeover work as originally priced.

Mr. Foust assembled the Change Order (Change Order No. 1, D-57)[49] that formed the initial contract with Kelchner to perform takeover work on Phase 1B.[50] Change Order No. 1 did not include all of the required takeover work; as far as the Court can tell, its scope was limited to work that RMC indisputably was required to do, had not done, *and* had not billed for.[51]

The Court credits Mr. Foust's testimony about where the figure of $739,690.87 came from and, relatedly, the rationale for using that figure for the amount to be paid Kelchner for the takeover work. Specifically, he came up with the amount he believed was left in the Phase 1B contract for the purpose of assembling Change Order No. 1, added to that amount a 25-percent cushion to account for contingencies, and then added an amount (somewhat more than $120,000) for coating of the manhole covers but that additional amounts were added as well. (Tr. 2.269:23–271:19; Tr. 3.22:21–23:3, 24:8-17). Mr. Foust was clear that (in his view, at least) this figure of $739,690.87 was all for takeover work. (Tr.3.31:15-18).

Mr. Foust also testified, in response to the Court's inquiry, that the coating of the manholes was fairly included within the scope of the takeover work because, even though it was not listed as its own line item in RMC's scope of work, it was something that RMC would have been expected to have done. (Tr. 3.32:7-33:22). The Court then asked him essentially why adding an additional amount for work that was already included in a line item for which WFC seemingly had

---

[49] Change Order No. 1 was, specifically, Change Order No. 1 (D-57) to Kelchner's contract with WFC to take over the work on Section 16 that RMC originally had contracted to complete. (Tr. 4.147:12-22, 162:7-12). For avoidance of confusion, it is worth noting that Mr. Keiser refers here to "Sections 6 through 11, 13 through 15," (Tr. 4.147:17-18), he is reading language in Change Order No. 1 that refers to sections in *the contract* whereby Kelchner to complete Section 16 in Phase 1B, not sections in *Phase 1B* (like Section 16).

[50] Mr. Foust also was the one to decide what work was treated by WFC as takeover work and what work was treated as repair work. (Tr.3.36:24-37.4).

[51] As set forth below, WFC makes an additional, much larger claim for alleged takeover work performed by Kelchner. At least some of this work was, according to WFC, work that RMC was contractually required to perform and "had billed for, but *not* performed." (Doc. No. 111 at 38) (emphasis added).

already (more than) accounted for by taking the amount left in the contract and adding 25 percent. The Court found his answer(s) unpersuasive in justifying an additional amount, in Change Order No. 1 in particular,[52] for manhole coating. Among other problems, he admitted that WFC could have taken the same approach with other specific work—i.e., adding an additional amount for that work even though it was actually within the scope of a line item already accounted for in the amount left in the contract—but did not do so, and instead took that approach only for the manhole coating. (Tr. 3.33:24-36:13).

And when asked point-blank at trial by counsel for WFC whether "the $739,690.87 [was] a reasonable amount to pay Kelchner for it to do the work that is set out in Change Order No. 1," Mr. Foust did not answer in the affirmative; instead he responded by what can fairly be called hemming and hawing, attempting to explain that WFC's *approach* was *justifiable* but without ever answering the question of whether the $739,690.87 *amount* was *reasonable*. (Tr. 3.23:16–24:17).

This amount was not negotiated with Kelchner and was instead derived and dictated unilaterally by WFC (i.e., Mr. Foust). (Tr. 3.22:24-23:3). Moreover, Mr. Foust did not solicit bids from any other contractors to do the takeover work, claiming—unpersuasively and without support, in the Court's view—that so doing would have "required tons of research" would take "months" to "put down on paper [ ] all the stuff that was remaining to do." (Tr. 3.83:16–84:5).

There appears to be no dispute that WFC's expenditure of the amount left in the Phase 1B contract ($501,994.23) amounted to action in reasonable mitigation of damages and thus is recoverable. And although the Court upon reasonable search has been unable to find the proposition stated (perhaps because it is assumed to be obviously true). The Court concludes that

---

[52] It is important to keep in mind that the question for the Court at this particular juncture is the extent to which the expenditure of the claimed $739,690.87 represented a reasonable amount to mitigate RMC's failure to complete whatever work was specified *in Change Order No. 1* in particular, and not other change orders (for either takeover work or repair work) that were issued.

amounts spent in reasonable mitigation of breach are awardable. So WFC will be awarded this $501,994.23.

But the Court finds that on the instant record, RMC has met its burden of showing that expenditures above this amount were not in furtherance of reasonable mitigation.[53] Even understanding that RMC bears the burden on this point, and that the Court should grant WFC wide latitude rather than "Monday morning quarterback" WFC's decisions regarding mitigation, the Court finds that WFC's decisions have been affirmatively shown to be simply arbitrary. The decision to add 25 percent (as opposed to, say 0 percent on the one hand or 50 percent on the other) to the amount left in the contract has been affirmatively shown to be a matter of fiat on the part of Mr. Foust, not supported by, for example, his perception of industry standards on the particular takeover that was the subject of Change Order No. 1 in particular. The same is true of the decision to add more than $100,000 for coating the manhole covers.[54]

Moreover, WFC cannot claim that it reasonably decided that the course it took was preferable to the alternatives, because the record affirmatively shows that WFC simply did not consider any alternatives whatsoever. It did not consider the possibility of using any contractor other than Kelchner. Having settled on Kelchner, it did not consider asking Kelchner to submit a bid (which could have turned out to be lower than what Kelchner was offered, which could have been as low as the amount left in the Phase 1B contract, for all the Court can tell). And it did not

---

[53] The portion of RMC's Proposal attacking WFC's claim of reasonable mitigation of its damages in connection with the takeover work is found at Doc. No. 110, at 16-21. Therein, RMC relied in certain points on which the Court does not rely, but it did essentially cover the Court's rationale herein for finding that alleged mitigation expenditures above the 501,994.23 was not reasonable.

[54] However, that is *not* to say that amounts paid by WFC to Kelchner to coat the manholes are not recoverable on some other theory or to some other extent. Specifically, the Court's ruling right here does not preclude recovery by WFC for amounts it actually paid to Kelchner pursuant to *other* change orders, on the grounds that such coating was within the scope of the work that RMC agreed to perform under the WFC contract but went unperformed by RMC.

consider asking Kelchner for doing the job for the amount left in the contract or indeed any other amount less than the amount it unilaterally offered Kelchner. The Court finds that WFC's failure to consider alternatives at all affirmative cuts against the notion WFC "exercise[d] reasonable care and diligence to avoid loss or to minimize or lessen the resulting damage" from RMC's breaches. *Cook & Nichols, Inc.*, 480 S.W.2d at 545.

Relatedly, the record affirmatively shows that WFC had no particular basis to believe that all of the $739,690.87, or indeed any particular amount over $501,994.23, was necessary to induce Kelchner to do the takeover work.

The Court realizes that RMC bears the burden on the issue of mitigation of damages, meaning that generally it (and the Court) cannot rely on an *absence of evidence* in the record to support its position. But the Court is not relying on an absence of evidence. Instead, it is relying on the *existence of evidence* in the record that affirmatively shows an *absence of circumstances* to suggest that it was reasonable to do what WFC did: unilaterally, and without negotiation with Kelchner or consideration of any alternatives, dictate that the initial takeover work be done for more than $739,690.87 and for $501,994.23 in particular. "The court finds that the cost of performing those procedures was in excess of what [WFC] should reasonably have been required to expend in an attempt to mitigate damages." *Buras v. Shell Oil Co.*, 666 F. Supp. 919, 924 (S.D. Miss. 1987). So the Court declines to award more than $501,994.23 as consequential damages in the form of reasonable amounts spent to do the takeover work made necessary by RMC's breach of the Phase 1B contract.

          ii.    WFC will be denied all of the claimed additional $1,501,843.60 paid to Kelchner for alleged additional takeover work.

At trial, WFC represented that it was seeking to recover an additional $1,501,843.60 for additional takeover work.[55] As to this claim, the Court is at a loss. The Court perceives WFC (and its witnesses) as saying two separate things simultaneously: (i) that the way to accurately estimate the cost of completion was to take the amount truly left in the contract, multiply it by 1.25, and then add the purported amount necessary to cover the manholes (and arrive at the figure of $739,690.87); and (ii) that the way to accurate estimate the cost of completion was to take the figure ($739,690.87) derived by the formula just stated, and add to it myriad figures (totaling $1,501,843.60) for things that purportedly needed to be done to complete the work in Phase 1B.

WFC made clear at trial that the figure referred to in (ii) above was what it sought to recover for payments for takeover work. (Tr. 1.150:24-151:8). Through questions of its counsel, WFC characterized the $739,690.87 as merely the "initial" takeover work, (e.g., Tr. 1.144:2, 151:6). And WFC implied that the remaining $1,501,843.60 was also takeover work, which is to say for work that RMC did not complete despite supposedly being contractually obligated to complete. But having scoured the record, the Court simply cannot find a basis to say that the $1,501,843.60 was for work that *RMC actually* was required to do and yet was *not* work encompassed within the work that was supposed to be done for the amount left in the contract. Part of this is because the testimony of WFC's own witness, Mr. Foust, was to the effect that the amount left in the contract (plus, in his view, but not the Court's view, an extra 25 percent plus an extra amount for coating the manholes), was the appropriate amount for completing the takeover work, and the Court simply does not see where the conflicting notion (that actually an extra approximately $1.5 million was

---

[55] In what appears to be another of the parties' miscues regarding the figures herein at issue, RMC's Proposal referred to the figure as $1,540, 916.98. (Doc. No. 110 at 20). Here, RMC plainly has confused that figure, which is the figure WFC had asserted for Phase 1B *takeover* work, with the figure of $1,501,843.60, which is WFC's asserted figure for Phase 1B *completion* work; elsewhere, RMC correctly states what WFC is seeking, without confusing (transposing) these two figures. (*Id.* at 4).

required to complete the takeover work) was substantiated. WFC's attempts to substantiate this were few and unpersuasive. Take, for example, the following exchange on direct examination by WFC's counsel of Mr. Smith:

> Q. And then even after the initial change order was signed in this amount of $739,000, you still continued to receive other change orders? A. Correct. Q. And why was that, Mr. Smith?

> A. Because the categories that were in RMC's contract of the line items had lots of incidental items associated with it as part of it. And then some of it was, it was, in my opinion, underbid. It's going to cost more than what they bid.

(Tr. 1.144:10-19). Upon request of RMC's counsel, the Court struck this testimony as speculative. (Tr. 1.146:3). But even if the testimony had survived, it would have run headlong into Mr. Foust's testimony that the cost of completing the takeover work was $739,690.87, not $739,690.87 plus $1,501,843.60.

On this topic, the Court credits the testimony of Mr. Keiser, Kelchner's then-project manager, not least because the Court does not perceive a reason why he would be biased in favor of either side. Mr. Keiser made clear that the work, and the cost, referred to in (i) above was reflected in Change Order No. 1, and that the additional work, and cost, referred to in (ii) above was reflected in 11 additional change orders, the effect of which was to add $1,501,843.60 to the cost of completion of Phase 1B. The Court therefore must ask why, since WFC otherwise had contended that the $739,690.87 per Change Order No. 1 represented a reasonable cost of completion for Phase 1B, the Court should find instead (per WFC's simultaneous and conflicting assertion) that an additional $1,501,843.60 (per 11 additional change orders)[56] should be added to

---

[56] As noted above, the first change order was No. 1, and (as noted herein) it was for takeover work. The additional change orders were Nos. 2, 4, 5, 6, 7, 9, 10, 12, 13, 15 and 17. Of those eleven change orders, six (Nos. 4, 6, 9, 12, 15 and 17) purported to reflect takeover work, and five (Nos. 2, 5, 7, 10 and 13) were for repair work. (D-8). Alas, in WFC's Proposal, unlike in its trial presentation, WFC does not make claims clearly broken down as repair costs or takeover costs, and its requested figures from its Proposal do not

the cost of completion necessary to mitigated RMC's breach in the form of failure to complete Phase 1B.

On this point, Mr. Keiser provided pertinent testimony as to how those 11 change orders came about it in the first place. The Court sets out this testimony below, choosing for ease of reading to forego indentation and single spacing of it:

Q: .. . .[H]ave you ever heard of a document identified as a PCO?

A. Yes, sir.

Q. Does that stand for proposed change order?

A. Could be proposed. I've also heard potential change order.

Q: Okay. And have you ever heard of something that's sometimes referred to as a change order request?

A. Yeah, that's correct.

Q. Are they synonymous?

A. Yes. In my way of thinking, they are, sir. Yes.

Q. Are they part of the evolutionary process to modify a contract via change order?

A. Yes, they are.

Q. Which typically comes first? The PCO or the change order?

A. The PCO.

---

always match the precise figures in key damages-related trial exhibits like D-8 and D-332, thus making difficult a post-trial assessment of what is properly awardable to WFC as "repair" costs. To the extent that this approach has made the Court unable to determine everything that WFC is asking for and why it claims to be entitled to it, that is on WFC, in the view of the Court. However, WFC's Proposal does, helpfully, break down requested costs by Change Order. And because WFC at trial clearly presented each change order is related exclusively to "takeover" costs or exclusively to "repair" costs, the Court has conducted its analysis likewise—i.e., change order by change order for each change order presented as one for repair costs. But the Court notes that it will not award as repair expenses any expenses that are reflected on Nos. 4, 6, 9, 12, 15 and 17 rather than on Nos. 2, 5, 7, 10 and 13.

Q. Okay. And then is it preferable that change orders be signed?

A. Yes, sir.

Q. In your experience, are the change orders signed before additional work commences or afterwards?

A. In a case like this where it—it would be after the work had commenced.

Q. Okay. So would the evolution be the preparation of a PCO that evolves into a CO or change order?

A. That's correct.

Q. Okay. And the defendant has previously introduced numerous PCOs, and they say "Wood" at the top. That's Kelchner, right?

A. That's correct, sir.

Q. Okay. And were you aware that PCOs were being prepared by somebody in connection with the expansion work for 1B?

A. Yes, I was aware, sir.

Q. Okay. I'd like for you to explain to the Court the process that occurred that took that number of $739,000 and evolved into an additional 10 or 11 change orders.

A. Additional things that we found through the course of doing work would be added as additional PCOs. And those PCOs would be summarized at some point, whether it be at the end of the month or possibly at the end of a section of work, into a CO, a change order.

Q. I want you to assume, for purposes of this question, a certain fact that may or may not be true. But I want you to assume that Mr. Foust testified that the PCOs were at the suggestion of Kelchner. Okay?

A. Okay. I'll assume that.

Q. Do you agree or disagree with that?

A. We were—we didn't bring up the PCOs. It was the work we were directed to do basically from a list from Durham of the work that they wanted to have done. Those were summarized into PCOs. And so it was our way of documenting back how much time, material, and labor it took to perform that work. That was on a list given to us from Durham.

Q. Okay. And Durham is WFC, correct?

A. That's correct.

Q. So is it accurate to say that you would get some request to perform work?

A. Yes, it is accurate, sir.

Q. And did that evolve into the subsequent preparation of a PCO?

A. Yes, it did, sir.

Q. And did that evolve into the subsequent preparation and execution of a change order?

A. Yes, sir.

Q. Was it more often or not the case that it was the developer asking you to do the work that evolved into a PCO?

A. I would say it was almost always the developer asked us to do the work that initiated it.

Q. And who made those requests for WFC?

A. We were regularly given a list by Ray Smith of items that he wanted to have us take care of. It was a list. When we got those lists, we'd look them over and also ask for a priority because the items were on the list, which ones did they want to have us complete first and everything else so we could schedule the crews and the materials needed to be able to perform those.

Q. Was it your testimony that more often than not, the origin of that was WFC?

A. Yes, it is, sir.

Q. Would you say that was the case 50 percent of the time or more?

A. I'd say more.

Q. What is your approximation of the percentage of PCOs that arose from requests made by the owner?

A. I would say in the range of 90 percent.

Q. Okay. And those PCOs evolved into the change orders?

A. That's correct, sir.

Q. Which expanded the 1B work from $739,000 to 2.2 million?

A. That's correct, sir.

Q. Okay. Did you draw any conclusions from the fact that 90 percent of these requests, the origin was from the owner?

A. It was—they had their almost like a shopping list or a wish list of what they wanted to have accomplished, and he would bring those to us of what they wanted to have done, so it was at their direction.

Q. Okay. Now, I know what you mean, but I want you to expand. When you said a wish list, what do you mean by that?

A. Well, items that he had deemed that he would want to get accomplished, wanted us to perform; tasks to get the project to where he wanted to be at, you know, completing the project. He would come up with a list of things he wanted to have done, whether it was from observation or, you know, wherever the basis of it was. But he would bring us those lists of what work he wanted to have us do.

Q. And you assumed you'd be paid for that?

A. Correct, sir.

Q. And, therefore, did you agree to do that?

A. Yes, we did, sir.

Q. And did that lead to the execution of approximately 12 change orders?

A. Yes, sir.

Q. Which increased the price from $739,000 to approximately 2.2 million?

A. That's correct, sir.

Q. Okay. So that's the case with 90 percent of the PCOs?

A. Yes, sir.

Q. Okay. How would you describe the origin of the remaining 10 percent of the PCOs?

A. It might be something that we had found in doing the work and we would bring it to his attention, get his approval before we would proceed on it. We didn't ever go out and just start doing things without the approval of Ray Smith.

Q. Did you ever go out and say any words to the effect: We've got a problem here. This is going to require more work. We're going to have to be paid more?

A. No.

Q. Okay. And the 90 percent of those PCOs, approximately how many PCOs were there?

A. Going from memory, I know it was over 200.[57]

. . . .

Q: Mr. Keiser, if you'll look on the board, of that $1,501,843.60, is that the portion of which you say your company initiated 10 percent of those requests for PCOs?

A. That would be our—yes. It's a guess, yeah. I'd say 10 percent.

---

[57] The parties subsequently stipulated that the exact figure for PCOs was actually 182, and that 91 of those were for purported completion work and half were for purported repair work. (Tr. 4.176:15-178:14).

Q. You feel like that 10 percent is more probable than not?

A. That's correct, sir.

Q. Okay. So the remaining 90 percent, did that come always from the owner?

A. That's correct, sir.

Q. Okay. And is that 90 percent what you described as the owner's wish list?

A. Yeah. I use the term "wish list" for the list he would give us for things he wanted us to get accomplished, yeah.

(Tr. 4.164:5-171:2).

It is true that on cross-examination by counsel for WFC, Mr. Keiser agreed that the $1.5 million was "all necessary to complete the lots . . . ." (Tr. 4.172:8-11). But this agreement in response to a leading question does not establish that the $1.5M ($1,501,843.60, to be precise) was for work that RMC actually was required to complete under the Phase 1B contract—let alone that all (or even *any*) of the $1,501,843.60 was reasonably spent in mitigation of RMC's breach of its obligations to complete the work it actually was required to do under the Phase 1B contract.

The Court notes, again, that it realizes that RMC bears the burden of showing the unreasonableness of WFC's purported expenditures to mitigate RMC's breach of its agreement to complete the work on Phase 1B. But the Court finds that RMC has carried that burden, pointing to aspects of the record suggesting that: (a) most if not all of the $1,501,843.60 was not spent in mitigation of RMC's failure to complete Phase 1B; and (b) WFC's own testimony was to the effect that the $739,690.87 was the cost of expended to complete the Phase 1B work that RMC had actually agreed to perform.

Accordingly, the Court denies WFC's request for the additional $1,501,843.60.

        iii.    WFC will be awarded $1,540,916.98 for amounts paid to Kelchner for repair work.

As noted above, at trial, WFC claimed an additional $1,540,916.98 in costs allegedly incurred to repair work done by RMC in an unworkmanlike fashion in violation of the Phase 1B contract. And as noted in a footnote above, given how WFC presented its damages claims at trial, the Court will award repair costs only with respect to costs reflected on Change Order Nos. 2, 5, 7, 10 and 13. The Court finds that the following damages are properly awardable as "repair" costs, i.e., costs reasonably spent in mitigation of RMC's breach of its agreement to conduct its work in a workmanlike manner, devoid of negligence.

With respect to Change Order 2, The evidence shows that WFC incurred the following expenses via bills from Kelchner:

- for hammer rental to remove rock in Section 16: $7,352.70[58]
- for installing billed-but-not-installed pipe in Section 16: $8,809.92[59]
- to repair a broken wifi conduit: $447.88[60]
- for equipment rental and hauling: $25,000.00[61]

Total: **$ 41,610.50**

The record also reflects a $1,605.50 charge in Change Order 2 for "move clay/spoils from section 16," (D-8), but the Court cannot conclude from the evidence presented that the relocation of these spoils in Section 16 was not properly includable within Kelchner's initial contract for Section 16. The Court thus excludes this amount from the tabulation of expenses under Change Order 2.

---

[58] D-69.

[59] D-71; D-8 at 2.

[60] D-72.

[61] D-73.

With respect to Change Order 5, the evidence shows that WFC incurred the following expense via bills from Kelchner:

to clean up and protect RMC excavations: **$4,494.90**[62]

D-161 showed numerous excavations left without proper safety fencing at the time of RMC's termination, corroborating the evidence provided in Exhibit D-77.

With respect to Change Order 7, the evidence shows that WFC incurred expenses in connection (*see* Ex. D62):

- To excavate a manhole requiring adjustment: $366.00[63]
- To repair sewer structures in Section 6 and 16 $44,276.37[64]
- To repair water valves in Section 7: $5,085.06[65]
- To repair and reset electrical boxes in Section 6: $2,047.35[66]
- To procure materials for sewer repairs: $51,767.14[67]
- To repair the sewer main in Section 7: $6,864.25

Total: **$110,406.17**[68]

Change Order 7 also included $23,474.30 (broken down in D-8 as and $21,834.30 and $1640.00) for work performed in Phase 1A. But Kelchner's work in Phase 1A has already been accounted

---

[62] D-77.

[63] D-78.

[64] D-79.

[65] D-82.

[66] D-83.

[67] D-85.

[68] In another example of a party's miscue that slowed down the Court (tasked as it was with ferreting out accurate figures) in issuing its findings of fact and conclusions of law document, WFC's Proposal stated this sum as $58,639.03—a figure that excludes the listed $51,767.14.

for elsewhere and thus is excluded here. The need for repairs to the electrical fixtures, sewer, water valves, and manholes have been corroborated by evidence recited in prior findings.

With respect to Change Order 10, the evidence shows that WFC incurred the following expenses:

| | | |
|---|---|---|
| - | To situate and backfill around water installations: | $3,362.29 |
| - | To remove a broken section of concrete pipe in Section 19[69] | $4,836.52 |
| - | To flush and run video tests of sewer lines in Sections 6, 17, 18 | $22,722.28 |
| - | To relocate electrical transformer bases[70] | $11,148.60 |
| - | To adjust water hydrants and fixtures, Sections 17–20 | $16,746.93 |
| - | To repair manhole K14 in Section 6 | $1,344.00 |
| - | To perform WHUD punch-list work in Sections 6, 7, and 22 | $66,476.15 |
| - | To clean, raise, and repair manholes in Sections 17–20[71] | $17,681.03 |
| - | To perform WHUD punch-list work in Sections 6, 7, 17 and 20[72] | $70,643.35 |
| - | To raise storm inlets in Section 21 | $759.24 |
| - | To perform additional WHUD punch-list work in Section 6 | $83,252.45 |
| - | To perform additional WHUD punch-list work in Section 7 | $65,018.08 |
| - | To perform sewer repairs in Sections 10 and 11 | $29,028.14 |
| - | To provide traffic control during sewer repairs in Section 7 | $6,200.00 |
| - | To test and repair sewer installations in Sections 17–20 | $63,477.30 |
| - | To repair sewer structures in Section 17–20 | $3,244.50 |
| - | To compact around storm-sewer structures in Sections 10 & 11 | $1,011.00 |
| - | To adjust water boxes and perform grading after sewer repairs | $13,418.30 |

---

[69] D-87.

[70] WFC incorrectly stated this figure as "$11,148.6" and thereby raised the issue of whether the correct figure is $11,148.60 or $11,148.06. The undersigned's review of D-64 (aided by a magnifying glass to enable him to read very minute print, as often was the case during the undersigned's preparation of these findings of fact and conclusions of law) revealed that the correct figure is "$11,148.60."

[71] D-93; D-94. This figure is the sum of $4063.53 and $13,617.50.

[72] D-95; D-96. This figure is the sum of $36,549.05 and $34,094.30.

| | | |
|---|---|---:|
| - | To fix sanitary sewer installations in Section 18 | $1,240.00 |
| - | To raise storm sewer inlets in Section 8, 10, 11, and 21 | $12,313.94 |
| - | To adjust water boxes in Section 17–20 | $3,126.50 |
| - | To rerun video tests on sanitary lines in Section 8, 10, 11, 21 | $7,633.90 |
| - | To perform WHUD punch-list work[73] | $377,584.83 |
| - | To obtain supplies for WHUD punch-list work[74] | $14,330.42 |
| - | To provide traffic control during repairs to Section 6 | $851.00 |
| - | To grade and backfill cubs following repairs in Section 20 | $3,811.50 |
| - | To perform additional WHUD punch-list work[75] | $139,854.09 |
| - | To relocate and raise electrical and water installations & grade | $25,419.50 |
| - | To install and adjust water service items in Section 6[76] | $16,761.50 |
| - | To backfill around installations and curbs in Sections 8 and 22[77] | $9,756.00 |

Total: **$1,093,053.74**

The Court excludes from this tabulation $5,143.67 (the sum of $1752.67, $1892.00 $1499.00, and identified as pertaining to PCOs 152, 156, and 177). These three PCOs refer to electrical repairs that do not appear to be identified on Exhibit D-7 and were not the subject to separate testimony. The Court cannot conclude that these PCOs entailed work necessary to repair defective performance by RMC.

---

[73] D-112; D-113; D-114;D-116; D-117; D-118. This figure is the sum of six different figures.

[74] D-115;D-115 confirms that the expenses on this PCO were for consumable items employed in the punch-list work, as opposed to the tools and equipment under PCO 87 (*see* Ex. D61) excluded in Paragraph 9.14, *supra*.

[75] D-122; D-123. This figure is the sum of $36,985.05 and $102,869.04.

[76] D-126; D-128. This figure is the sum of $15,32.00 and $1129.50.

[77] D-122; D-123. This figure is the sum of $7992.00 and $1754.00.

With respect to Change Order 13, the evidence establishes that WFC incurred expense as follows:

| | | |
|---|---|---|
| - | To lower storm inlets in Sections 8 and 21 | $1,368.00 |
| - | To install water service for Lot 165 | $2,379.00 |
| - | To raise meter boxes in Section 6, 8, and 22 | $6,874.00 |
| - | To repair sewer service in Sections 8, 10, and 11 | $5,654.35 |
| - | To perform work on repairing roads following sewer work | $13,529.00 |
| - | To perform WHUD punchlist work in multiple Sections | $44,451.35 |
| - | To repair and lower storm inlets in Section 8 | $7,386.00 |
| - | To perform sewer repairs in Section 8 | $15,934.50 |
| - | To perform road repairs after sewer dig-ups in Sections 6, 7, 22 | $9,493.00 |
| - | To work on water installations in Sections 7 and 22 | $4,169.45 |
| - | To install a riser on manhole U3 | $1,218.00 |
| - | To backfill after sewer repairs in Sections 10 and 11 | $5,675.00 |
| - | To perform sanitary-sewer work in Section 7 | $4,578.00 |
| - | To repair sagging sanitary main in Section 11 | $15,972.50 |
| - | To install omitted steps in manholes in Section 7[78] | $2,829.38 |
| - | To clean, survey, and grade around detention pond and swale | $113,977.95 |
| - | To grade and provide topsoil in Section 6 | $12,129.00 |
| - | To lower an irrigation sleeve improperly installed by RMC | $1,485.00 |
| - | To repair sagging sanitary main in Section 10 | $16,262.95 |

---

[78] D-144; D-148. This figure is the sum of $1426.00 and $1403.38.

| | | |
|---|---|---:|
| - | To procure materials for utility installations[79] | $24,759.56 |
| - | For barricades needed while working in road excavations | $919.03 |
| - | To obtain and move stone employed in sewer repairs[80] | $12,432.61 |
| - | To procure materials for manhole repairs | $988.52 |
| - | To rework electrical conduit installed by RMC in Section 6 | $8,321.19 |
| - | To install and paint fire hydrants | $2,014.51 |
| - | To perform grading around swale and detention pond | $24,929.50 |
| - | To procure video inspections in connection with sewer work | $923.91 |
| | Total: | **$360,655.26** |

Change Order 13 also included a PCO 238 (D-143), in the amount of $31,878. But this PCO states that it relates to repairs of conduit that were broken in the course of repairing water and sewer lines. In the absence of some other evidence that the damage to the conduit was unavoidable as a result of work by RMC, or that RMC had caused the damage to the conduit in the first place, the Court cannot conclude that damage that appears to have been caused by Kelchner's performance of its work is properly chargeable here. This PCO is omitted from the tally.

By the Court's calculation, these "repair" expenditures total $1,610,220.03. The Court is not sure why this amount exceeds the amount that WFC purported at trial to be claiming for payments to Kelchner for repairs (i.e., $1,540,916.98). And the Court finds that WFC is estopped

---

[79] The PCO associated with this entry on Exhibit D-8, lists a total requested charge of $25,425.71. (D-151 at 1). That amount includes $666.15 for "tools," which the Court would regard as non-chargeable. ( D-151 at 2). But the amount set forth on Exhibit D-8 (which the Court is using to track the figures above) reflects a deduction from the PCO in precisely this amount—i.e., it reflects a figure of $24,759.50, which is the difference between $25,425.71 and $666.15—so the Court does not separately deduct the tools charge again.

[80] D-153;D-154. This figure is the sum of $81017.17 and $4325.42.

to claim more than the latter figure. But finding that that figure represents reasonable mitigation from RMC's breach, the Court awards WFC $1,540,916.98.

3. <u>WFC will be awarded its claimed $155,633.70 in expenditures to "third-party" contractors for repairs</u>.

That leaves WFC's expenditures for alleged repairs allegedly necessitated by deficiencies in work that RMC did perform. The Court previously concluded that RMC failed to protect ongoing work as required by the Phase 1B contract by backfilling curbs along Misty Way and Edinburg Drive. The evidence established that WFC incurred costs in repairing these conditions:[81]

- to Road Worx to stabilize the road beds: $36,000.00
- to Rogers Group to excavate the roadways: $107,688.00
- to Rogers Group to repave the roadways: $11945.70

Total: $155,633.70

The testimony additionally established that it was necessary to expose and inspect electrical conduits that RMC laid without being properly licensed, and that WFC employed a company named Bouchard for this purpose, incurring expense in the process. (Tr. 3.52:3–18). The evidence established that WFC incurred, in correcting this work by RMC, the cost of paying John Bouchard $7,440.16.[82]

---

[81] D-8 at 5. It seems to the Court that the proper pinpoint cite here is 5, not 4 as stated by WFC.

[82] *Id.* Exhibit D-8 also reflects payments made to Ragan Smith for aerial drone footage and Gresham Smith for surveying, but the Court cannot discern from the evidence that these amounts, totaling $13,628, were incurred to correct or complete work within the scope of RMC's contracts. WFC does not in its Proposal seek, and the Court does not find WFC entitled to, damages for this amount.

The Court finds that the expenditures to contractors other than Kelchner constituted reasonable steps in mitigation of RMC's breaches of its obligation to perform the Phase 1B contract in a workmanlike manner. Therefore, it awards these amounts also to WFC.[83]

4. <u>WFC will be awarded some but not all of its claimed "delay" damages, i.e., damages allegedly sustained as a result of RMC's breach of its obligation to complete the work on the Phase 1B contract on a timely basis.</u>

The Court has already determined that RMC failed to perform the Phase 1B contract in the time provided. For this delay in the completion of the work required under the Phase 1B contract, WFC also seeks "delay" damages from RMC. As WFC explains, "WFC seeks three species of damages for delay: liquidated damages during the term of the contract, expenses [in the form of closing costs and accrual of interest] incurred for two bridge loans, and the diminution in the value of cash flow resulting from delayed closings." (Doc. No. 111 at 53). The Court will consider in turn each form of claimed damages.

i. Liquidated damages

The Phase 1B contract provided for liquidated damages. Under the Phase 1B contract, each milestone carried liquidated damages of $250 per day from the milestone date to the actual completion date. Here, because RMC never achieved any milestone past the first one, the liquidated-damages calculation runs through the termination date.

There is no dispute that the Phase 1B contract was terminated on October 12, 2017. Exhibit D-2 and mathematics establish the following figures:

---

[83] The combined amount is roughly $47,353.17 less than WFC purported to claim at trial for "repair" expenditures paid to a "third party," meaning, apparently, someone other than Kelchner. (D-332). The Court cannot efficiently explain the discrepancy (and indeed perhaps no one can). Part of the discrepancy, though, is likely due to the fact that as explained herein, the Court has declined to award WFC its expenditures to for curb repair paid to RT Goodwin. But other factors must be involved as well if, at trial, WFC was seeking to recover the same amount with respect to RT Goodwin that it requests in its Proposal: $75,242.11. The Court declines to either speculate about, or expend the judicial resource required to fully explain, this discrepancy.

| NTP | Milestone | Days | Due | Days Late[84] | $250 per day |
|---|---|---|---|---|---|
| 5/17/2016 | 2 | 253 | 1/3/2017 | 177.5 | $ 44,375.00 |
| 5/17/2016 | 3 | 366 | 4/26/2017 | 64.5 | $ 16,125.00 |
| 5/17/2016 | 4 | 358 | 4/18/2017 | 72.5 | $ 18,125.00 |
| 5/17/2016 | 5 | 412 | 6/11/2017 | 18.5 | $ 4,625.00 |

Accordingly, RMC incurred liability for $83,250.00 in liquidated damages under the Phase 1B contract. This figure is $1,000 less than that shown on WFC's damages summary (D-332), because the summary appears based on running the calculation through the day *following* termination, October 13, 2017. (*See* D-6 at 3).

WFC made demand for the liquidated damages on November 17, 2017. (D-6).

> ii.  Closing costs and interest incurred in connection with "bridge" loans.

Stanley Brown testified on behalf of WFC that when RMC fell behind on Phase 1B construction, WFC lacked sufficient revenue to fund its ongoing operations. His testimony on direct examination, which the Court credits, went in pertinent part as follows:

> Q:  Now, what effect, if any, did the delay that you were experiencing in having delivered lots in Phase 1B have on the financing of the Durham Farms development?
>
> A.  Well, it was a very tough road. Like any business, we model our financial needs, capital needs, with cost of goods—in our case, development lots, you know, pavement, sewer lines, waterlines, storm lines, streets, cost of development—versus income from the sale of the lots. And we certainly started with a large capital contribution by our equity partners. But the goal is to then become a project that spends money and makes money as we go through the course of the development. When we hit the delays that we were seeing in Phase 1B, it had two effects: one on Phase 1B lots themselves, but more importantly, we had such strong market acceptance of our lots that we opened up and started our Phase 2 development contract. But the Phase 2 development contract couldn't proceed until Phase 1B was completed, largely because of the rules of the White House Utility District where

---

[84] Although RMC is not inherently entitled to any extension of the deadlines in the Phase 1B contract, the Court concludes that WFC is effectively estopped at this point from withdrawing the prior concession of an extension of 82.5 rain days reflected in its Rule 26 damages disclosures. The "Days Late" figure is the total time elapsed between the due date and the termination date, minus 82.5.

they dictated the method of laying sewer pipe, and you have to start at the low end and go up. And Phase 2 was upstream of Phase 1B. So we—the delay in 1B was the delay in the 1B lots, but it was also having a dramatic effect on Phase 2, and, in turn, all of that was delayed. We're still spending dollars, but we're delaying the income back to help finance the project.

Q. And what effect financially did the delay in the revenue that you were expecting have on the funding of the improvements going on in both Phase 1B and in Phase 2?

A. Well, it made it difficult, in all honesty. I mean, we always had the final option of going back to our equity partners and finding the cash, so it was not a question that we would not pay the bills, but we typically did not—would prefer not to do that after you've had their initial big equity check written. So what we did do was pursue commercial development loans from commercial banks. We took a while to get, but we were ultimately successful in getting two commercial development loans which helped to basically tide the cash flow until we got through the Phase 1 — we sold the Phase 1B and Phase 2 lots.

. . . .

Q. And what effect did it have on WFC in this development to have funds delayed in this amount for what is here apparently about an eight-month period of time?

A. Well, the most immediate effect was, we started to have limited cash available within this entity, and we had to then reach out and get commercial development loans to kind of bridge the gap until the revenue showed up.

(Tr. 3.204:16-206:7, 224:7-13).[85]

The lending bank was Wilson Bank & Trust. (Tr. 3. 206:8-14, 225:14-16). Wilson Bank extended two different credit facilities, one for $5 million and one for $6.5 million. (Tr. 3.231:17-21). Those credit facilities were subsequently extended (beyond the one year). (*Id.*).[86]

---

[85] The reference here, which will become clearer below, is to the delay—specifically from September 2017 until April 2018 (actually a *seven*-month delay—in the receipt of $432,000 from closings on lots in Section 9 in Phase 1B).

[86] Regarding the lending by Wilson Bank, WFC's Proposal states as follows:

[WFC] accordingly obtained a one-year commercial loan from Wilson Bank & Trust. (Tr. 3.224:7–19, 232:14–19.) That loan was subsequently renewed for another one-year term and then paid. (Tr. 3.230:24–231:21.)

WFC incurred interest and closing costs in connection with that loan as follows:

| | |
|---|---|
| First year's interest | $128,861.70 |
| Second year's interest | $227,187.46 |
| Closing costs | $215,115.15 |
| Total: | $571,164.31 |

(Ex. D-332; Tr. 3.231:4–232:10.)

The Court concludes that the proof is sufficiently clear to establish that the delays prompting WFC's recourse to a commercial credit facility were proximately caused by RMC's untimeliness in performing the Phase 1B contract. The Court concludes that the proof is sufficiently clear to establish that the obtaining of this loan was a reasonable step in mitigation of RMC's breach of its obligation to perform the contracted work in Phase 1B on a timely basis. True, Mr. Brown did testify that WFC "had the final option of going back to our equity partners and finding the cash"—meaning that it was not a question [of whether] WFC would "pay the bills"; he also testified that WFC would "prefer not to do that." (Tr. 3.205:22-25). But that testimony does not establish that WFC, to be deemed to have acted reasonably in mitigation, was *required* to go back to its equity partners to request cash to make up a shortfall caused by the delay—a request that (despite Mr. Brown's apparent optimism) by its very nature was not guaranteed to be honored. As to the amount of costs incurred in connection with these breach-mitigating credit facilities (loans), there is no evidence that the interest and closing costs were unnecessary, avoidable, or imposed at commercially unreasonable levels.

---

(Doc. No. 111 at 54). To the extent that the language here quoted says something additional to or different from what the Court says in the paragraph to which this footnote is appended, that language is inexact and unsupported by WFC's citations. Ultimately, such inexactness and lack of support proved immaterial here, but they were the kind of thing the undersigned had to look into and resolve before issuing these findings of fact and conclusions of law.

iii. <u>WFC's will be denied damages in the form of delayed profits from delayed closings.</u>

According to WFC, this claim encompasses lots in Section 8, 9, 10, 11, 17, 29, 20, and 24–26 (these last being in Phase 2).[87] Four of the delayed closings shown by WFC's evidence occurred with respect to purchase-and-sale agreements with builders (each agreement for multiple lots) were executed prior to RMC's termination. (D-256; D-261; D-263; D-273). The remainder were executed after RMC had already left the site. (D-255; D-257; D-260; D-267; D-270).

Above, the Court has found that breaches by RMC caused damage in the form of delayed cash flow to WFC that resulted in WFC incurring damages in the form of loan closing costs and interest. These damages were ascertainable in a specific amount and were not speculative. Accordingly, the Court has awarded them. But that does not mean that other amounts claimed by WFC as alleged damages from RMC's breach are awardable.

As noted above, to recover an item of damages, a plaintiff must both (a) prove (as opposed to leave uncertain or speculative) the *existence* of damages stemming from a breach, and (b) introduce evidence suitable for a reasonable assessment of those damages and ultimately prove *the amount* of those damages with reasonable certainly. With respect to damages in the form of delays in making profits from the closing of sales to builders of certain lots, the Court will assume here arguendo that the first requirement is satisfied,[88] but it cannot find the second requirement satisfied.

---

[87] The Court is not so sure. From the looks of Exhibit D-9, it seems to the undersigned that 18 should be included on the list and 29 excluded, but ultimately this discrepancy is immaterial.

[88] RMC's breaches caused delay in the completion of Phase 1B (and perhaps also Phase 2, as WFC contends) and thus the time at which WFC had available ready-to-build lots to deliver to builders. That fact is consistent with, but does not necessarily mandate, the conclusion that RMC's untimely performance delayed the closing of lots in the subdivision. Reaching this conclusion requires the additional step of establishing that sales of the lots (to builders) would have closed earlier than they did had they been ready, which seems likely but is not necessarily the case. But the Court need not and does not decide whether this conclusion is sound. Instead, the Court concludes, as discussed below, that the *amount* of these kinds of

Regarding this claim, RMC aptly (though with one imprecision noted below) explains:

> In connection with [this aspect of] its claim for "delay" damages, WFC contends that it is owed $2,111,881 [D-9 and D-31]. On this claim, it produced only 1 witness; namely, one of the owners of WFC's management company, Stan Brown. WFC did not introduce the testimony of any accountant, real estate agent, real estate appraiser or financial analyst.

> Mr. Brown testified that he prepared projections for sales revenue of $26,193,069 which, per his calculations, he projected would be received during the early stages of the project. He conceded that WFC ultimately captured the slightly higher figure of $26,204, However, Mr. Brown testified that the captured revenue came in 8 months later than he had projected. He then arbitrarily applied a 15% internal rate of return and calculated the "delay" damages at $2,111,881

(Doc. No. 110 at 25) (citations omitted). The idea reflected in Exhibit D-9 and Mr. Brown's testimony appears to be this: (i) WFC had projected closings on the sale (at projected prices stated in terms of the value of the dollar as of September 2017) of all implicated lots, to begin in September 2017 (with closings that month anticipated to bring in $6,297,000) and continue in varying amounts at various times until June 2019; (ii) due to delays occasioned by RMC's breaches, WFC's various closings on the sale (at prices different from the projected prices that had been stated in terms of September 2017 dollars) of all implicated lots began later than they otherwise would have and continued in varying amounts at various times until January 2020; (iii) due to the respective delays in the sales, to understand the financial position WFC would have been in absent RMC's breach, the amount that WFC ultimately received on a particular sale should be discounted at an annual rate of 15 percent from the date of the sale back to September 2017; and (iv) the difference, stated in terms of September 2017 dollars, between what WFC projected itself to receive from these sales and what WFC actually received was $2,111,891.

---

damages from RMC's breach is not reasonably certain, because the Court cannot endorse either that the particular (15 percent) "internal rate of return" asserted by WFC is reasonable or that the length delay in particular respective closings *attributable to RMC's breach* was what WFC claims it was.

It is worth noting the imprecision in RMC's above-quoted reference above to the revenue coming in eight months later than Mr. Brown anticipated. True, in one portion of his testimony, he is referring to an eight-month delay (actually seven-month delay as noted in a footnote above) in the receipt of $432,000 from a number of closings in April 2018. Actually, however, funds from various delayed closings came in at different times, and the length of the asserted delay for a particular tranche of funds varied with respect to particular funds received; this is clear both from Exhibit D-9 and from Mr. Brown's testimony that the delay was "8 to 12, 14 months." (Tr. 3.260:23-25).

RMC additionally notes correctly that with respect to both the Phase 1A contract and the Phase 1B contract, "the contract does not provide for a 15% rate for delays." (*Id.* (citing D-3; D-4)). WFC is relegated, instead, to arguing that the 15 percent rate is reasonable. But WFC actually does not do so in its proposal; it undertakes no effort to support the specific figure of 15 percent that was chosen by Mr. Brown.

And Mr. Brown's testimony does not support that percentage. He did not testify on direct or cross examination as to the basis for it. So it fell to the Court to ask about it at the close of cross examination:

> THE COURT: I had a question, and then we'll do redirect. The internal rate of return I think you testified that you used was 15 percent?
>
> THE WITNESS: Correct.
>
> THE COURT: All right. What's that based on?
>
> THE WITNESS: That was based upon our, at that time, business plan estimate of our project performance.

(Tr. 3.252:17-24). Mr. Brown was not asked about the basis for this on redirect examination. So the Court is essentially left solely with the assertion that 15 percent is appropriate because WFC said (and says) this is the right figure. WFC does not explain *why* it says that 15 percent is the right figure; even assuming that WFC's "internal rate of return" is the right figure to use for determining present value back to September 2017 (something WFC has made no effort to establish), the Court cannot conclude that WFC's internal rate of return actually was 15 percent based on Mr. Brown's cursory say so.[89] This is patently inadequate to support the figure. And the Court declines to (and indeed cannot) take the position that the figure of 15 percent, though unsupported, somehow is reasonable given judicially noticeable facts about the economy at the time; the Court is unaware of any such facts that would make it reasonable to assume that a business in WFC's particular position would generate an internal rate of return of 15 percent—or, for that matter, anything close to that.

Similarly, the Court cannot accept that WFC's projected closing dates were reasonably certain, as would be necessary to make the resulting calculation of damages reasonably certain. As Mr. Brown admitted, these were mere *projections,*[90] (Tr. 3.248:17-249:20), which are based on assumptions, not guaranteed to be accurate, and which (at most, as far as Mr. Brown indicated) "may be probabilities." (Tr. 3.249:11-20). He also admitted that WFC's projections as to Section 16 (as to which WFC did not seek "delay" damages) were "false." (Tr. 3.250:2-20). He also admitted that his projections for all of the 150-200 developments he had touched on in his career, actual results were inconsistent with his projections, with actual results exceeding expectations

---

[89] As indicated herein, for some reason RMC did not specifically challenge at trial the notion that 15 percent was actually WFC's internal rate of return, but RMC's Proposal does (understandably enough) challenge that figure as "arbitrary."

[90] In context, Mr. Brown's testimony regarding the fallacy of sales projections clearly would apply to all aspects of the projections, including sales price *and time of sale.*

roughly 60 percent over the time and underperforming expectations 40 percent of the time. (Tr. 3.251:6-252:12).

For these reasons, the Court must reject as unproven WFC's assertion that it lost $2,111,881 due to, essentially, the delay between its projected sales dates and amounts (stated in terms of September 2017 dollars) and its actual sales dates and amounts.

5. <u>In summary, WFC will be awarded $2,852,959.22 on its counterclaim</u>.

For the reasons set forth above, WFC is awarded the sum of $501,994.23 (for original takeover work by Kelchner on Phase 1B), $1,540,916.98 (for repair work by Kelchner on Phase 1B), $155,633.70 (for repair work by "third party" contracts on Phase 1B), $83,250.00 (as liquidated damages with respect to Phase 1B), and $571,161.31 (for closing costs and interest on credit facilities occasioned by delays on Phase 1B). The total award to WFC on its claims, therefore, is $2,852,956.22.

### AMOUNT OF FORTHCOMING NET JUDGMENT AND NEXT STEPS

With RMC being awarded $865,082.25 and WFC being awarded $2,852,956.22, WFC will be awarded a net judgment of $1,987,873.07, via a separate judgment to be entered at the appropriate time. For this time being, the Court will hold off on entering such judgment, pending the parties' submission—within three weeks of the date of entry of these findings of fact and conclusions of law—of a joint notice (or, if necessary, separate notices) regarding how the Court should proceed with respect to RMC's pending claims against Philadelphia Indemnity.

A judgment consistent herewith shall be entered separately.

IT IS SO ORDERED.

_Eli Richardson_
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE